**DELTA AIR LINES, INC., Plaintiff,**

v.

**UNITED STATES of America, Federal Aviation Administration, Langhorne M. Bond, Administrator, Federal Aviation Administration; H. L. Reighard, Federal Air Surgeon, Federal Aviation Administration, Defendants,**

v.

**AIR LINE PILOTS ASSOCIATION, INTERNATIONAL, Intervenor.**

**Civ. A. No. C78–445A.**

United States District Court, N. D. Georgia, Atlanta Division.

May 16, 1980.

James W. Callison and Gerald M. Mayo, Delta Air Lines, William E. Sumner and Barbara A. Speck, Long, Aldridge, Heiner, Stevens & Sumner, Atlanta, Ga., for plaintiff.

Robert J. Castellani, Asst. U. S. Atty., Atlanta, Ga., Kathlynn G. Fadely and John R. Harrison, Washington, D. C., for FAA.

Gary Green and Daniel S. Kozma, Washington, D. C., for ALPA.

## MEMORANDUM OPINION AND ORDER

VINING, District Judge.

This is an action for injunctive relief, seeking to halt certain practices by the Federal Aviation Administration ("FAA"), its Administrator, and the Federal Air Surgeon. Because rights and interests of air line pilots are involved, the Air Line Pilots Association, International ("ALPA") was allowed to intervene. Currently before the court are Delta's and ALPA's motions for summary judgment.

### I. FACTS

Delta contends that an acceptable three-point plan for insuring air safety has been

properly adopted by the FAA but that in certain significant aspects the current practices of the FAA deviate from that plan in a manner contrary to the dictates of Congress and the FAA's own regulations. These departures place airmen in commercial aircraft cockpits who have established medical histories of angina pectoris and myocardial infarction (heart attacks), personality disorders, loss of consciousness, and other major medial disabilities. Delta asks this court to enjoin the issuance of certificates to such persons and to enjoin the designation of flight functions by the defendant Air Surgeon. ALPA asks that the complaint be dismissed.

### A. The Three-Point Plan for Insuring Air Safety

The Federal Aviation Act (49 U.S.C. §§ 1301–1542) ("Act"), the Department of Transportation Act (49 U.S.C. §§ 1651–1659), and the Federal Aviation Regulations (14 C.F.R. Parts 1–199) govern all aspects of the United States air commerce system. This system currently is administered by two agencies, each with its own distinct area of responsibility. The Civil Aeronautics Board currently is responsible for air carrier economic regulation, and the FAA, within the Department of Transportation, is responsible for the promotion of safety in air commerce.

The FAA is administered by Defendant Langhorne M. Bond, the Federal Aviation Administrator ("Administrator"). As demonstrated by the Act, the Regulations, and relevant judicial authorities, the central focus of the powers and duties of the Administrator is safety in air commerce. The Act directs the Administrator "to promote safety of flight of civil aircraft in air commerce" by issuing regulations governing practices which affect safety. 49 U.S.C. § 1421(a). In certain specific areas the Act directs the Administrator to prescribe minimum standards and reasonable rules and regulations as may be required "in the interest of safety." 49 U.S.C. §§ 1421(a)(1)–(5). The Act also gives the Administrator authority to prescribe "[s]uch reasonable rules and regulations, or minimum standards, governing other practices, methods, and procedure, as the Administrator may find necessary to provide adequately for national security and safety in air commerce." 49 U.S.C. § 1421(a)(6).

Within this broad mandate to promote air safety, the Act authorizes the Administrator to certify airmen, aircraft, air carriers, air navigation facilities, air agencies, and airports. The dispute in this case involves the Administrator's certification of airmen pursuant to 49 U.S.C. § 1422 and specifically the medical standards attendant to the certification process.

An examination of the medical certification procedures reveals a three-point plan for insuring air safety (hereinafter sometimes referred to as the "Three-Point Plan for Insuring Air Safety"):

(1) The Medical Standards;

(2) The Special Issue Procedures; and

(3) The Procedures for Issuing, Repealing, or Amending the Medical Regulations.

### 1. *The Medical Standards*

The first step in the Three-Point Plan for Insuring Air Safety is the specification of medical standards for the certification of airmen.

Safety is again the hallmark of the airman certification procedures. The Act directs the Administrator to investigate each airman to insure that he "possesses proper qualifications for, and is physically able to perform the duties pertaining to, the position for which the airman certificate is sought" and to issue airman certificates in a manner designed "to assure safety in air commerce." 49 U.S.C. § 1422(b). In discharging this statutory duty, the Administrator requires as a condition to the issuance of an airman's certificate (which certifies the airman's aviation skills) that the airman obtain a medical certificate, which certifies his good health. 14 C.F.R. § 61.-3(c).

The Administrator has delegated, pursuant to 49 U.S.C. § 1344(d), limited portions of his statutory authority with respect to

airman certification to an officer of the FAA known as the Federal Air Surgeon. 14 C.F.R. § 67.25. Defendant H. L. Reighard is the current Federal Air Surgeon. The Regulations authorize the Federal Air Surgeon: (1) to perform medical examinations and (2) to issue, renew, and deny the medical certificates which are required prior to the issuance of airman certificates. 14 C.F.R. § 67.25(a).

Medical certificates are issued in three classes: first-class, second-class, and third-class. The Regulations set forth, in extraordinary detail, the medical standards required for each level of certificate. See 14 C.F.R. §§ 67.13, .15, .17. The division of medical standards into three classes has existed since 1942, and there are now, and always have been, only three specified classes of certificate which may be issued. The most favorable certificate, necessary for the holder to perform the most responsible cockpit functions, is a first-class certificate.

In an aircraft operated by Delta (and, presumably, by the other major air lines), the flight crew is composed of three airmen: a captain or "pilot-in-command," a co-pilot or "first-officer," and a flight engineer or "second officer." The "pilot-in-command" is the pilot responsible for the overall operation and safety of an aircraft during flight time. The "first officer" is the pilot who is second in command and who is to assist or relieve the captain in the handling of the flight controls of an aircraft while under way, including takeoff and landing of aircraft, and who is properly qualified to serve as, and holds a currently effective airman's certificate authorizing him to serve as, such first officer. The "second officer" is a qualified pilot holding a commercial license who, in addition, holds a currently effective flight engineer certificate and who is subordinate in command to the captain and first officer.

The Regulations provide that a captain of a commercial air carrier must hold an "airline transport pilot certificate," 14 C.F.R. § 121.437(a), which requires the issuance of a first-class medical certificate. 14 C.F.R. § 61.151(e). The Regulations do not require a first-class medical certificate for the first- and second-officer positions, 14 C.F.R. § 121.437(b), but Delta and other commercial air carriers typically require that all of its flight crew members meet the medical standards to possess and maintain a first-class medical certificate. Such requirements are designed to promote safety. For example, Delta's program for the training and advancement of pilots is designed so that an airman normally serves first as a second officer, then as a first officer, and finally as a captain. The program allows airmen possessing first-class medical certificates to progress naturally through these three levels of responsibility. (The Delta training program is designed by Delta pursuant to the mandate of the Regulations and must receive the initial and final approval of the FAA. 14 C.F.R. § 121.-401(a)(1) (1979)). Such training programs by Delta are designed in reliance upon the medical standards promulgated by the FAA.

The normal medical certification procedure for an airman applying for a first-class medical certificate begins with an initial medical examination performed by a private aviation medical examiner ("AME"). See 14 C.F.R. § 67.23. The AME reviews the medical history of the applicant and his current medical condition to determine if he meets the detailed medical standards. All medical certificates issued by AME's are considered affirmed unless challenged within sixty days. The Federal Air Surgeon and certain other FAA officials may reverse the decision within sixty days, or they may request further medical information within sixty days and reverse the decision within sixty days after receipt of the additional medical information. 14 C.F.R. § 67.25(b) (1979). The reversal of an AME's decision by other officials of the FAA is subject to reconsideration by the Federal Air Surgeon except where the reversal is based upon an absolutely disqualifying condition. If the AME initially denies the medical certificate, the airman may petition for reconsideration to the Federal Air Surgeon within thirty days. 14 C.F.R. § 67.-

27(a). A denial by the Federal Air Surgeon or by certain other FAA officials is deemed to be a denial by the Administrator and is appealable to the National Transportation Safety Board. 14 C.F.R. § 67.27(b).

If the AME's examination of an airman results in a diagnosis of, or reveals a history of, certain conditions, such airman is absolutely disqualified from receiving any class of medical certificate. These nine "absolutely disqualifying conditions" are an "established medical history" or "clinical diagnosis" of:

(1) severe personality disorder; [1]

(2) psychosis; [2]

(3) alcoholism; [3]

(4) drug dependence; [4]

(5) epilepsy; [5]

(6) disturbance of consciousness without satisfactory medical explanation of the cause; [6]

(7) myocardial infarction; [7]

(8) angina pectoris; [8]

(9) diabetes mellitus which requires drugs for control. [9]

These conditions were established in 1959 on the basis of a Congressionally funded study by the Flight Safety Foundation, Inc., which concluded that "none of these . . . conditions can be so precisely studied in the individual as to provide assurance that they will not interfere with the safe piloting of aircraft." 24 Fed.Reg. 7309 (1959).

This system of medical examination and the measurement of airmen against detailed medical standards for each of three classes of medical certificates, together with the designation of certain absolutely disqualifying medical conditions, constitute the first, and the most fundamental, point in the Three-Point Plan for Insuring Air Safety.

2. *The Special Issue Procedure*

The second point in the Three-Point Plan for Insuring Air Safety is the procedure for "special issue" certificates.

An airman who fails to meet the medical standards may petition to the Federal Air Surgeon for a "special issue" certificate. 14 C.F.R. § 67.19(a). In such cases the Regulations require the Federal Air Surgeon to conduct special medical flights or practical tests or special medical evaluations to determine whether the applicant "can perform his duties under the airman certificate he holds, or for which he is applying, in a manner that will not endanger safety in air commerce during the period the certificate would be in force." 14 C.F.R. § 67.19(a)(1). The Regulations specify: "Any operational limitation on, or limit on the duration of, a certificate issued under this section that the Federal Air Surgeon determines is needed for safety shall be specified on the airman or medical certificate held by, or issued to, the applicant." 14 C.F.R. § 67.19(b). The

1. 14 C.F.R. § 67.13(d)(1)(i)(a) (first-class certificates); 14 C.F.R. § 67.15(d)(1)(i)(a) (second-class certificates); 14 C.F.R. § 67.17(d)(1)(i)(a) (third-class certificates).

2. 14 C.F.R. § 67.13(d)(1)(i)(b) (first-class certificates); 14 C.F.R. § 67.15(d)(1)(i)(b) (second-class certificates); 14 C.F.R. § 67.17(d)(1)(i)(b) (third-class certificates).

3. 14 C.F.R. § 67.13(d)(1)(i)(c) (first-class certificates); 14 C.F.R. § 67.15(d)(1)(i)(c) (second-class certificates); 14 C.F.R. § 67.17(d)(1)(i)(c) (third-class certificates).

4. 14 C.F.R. § 67.13(d)(1)(i)(d) (first-class certificates); 14 C.F.R. § 67.15(d)(1)(i)(d) (second-class certificates); 14 C.F.R. § 67.17(d)(1)(i)(d) (third-class certificates).

5. 14 C.F.R. § 67.13(d)(2)(i)(a) (first-class certificates); 14 C.F.R. § 67.15(d)(2)(i)(a) (second-

class certificates); 14 C.F.R. § 67.17(d)(2)(i)(a) (third-class certificates).

6. 14 C.F.R. § 67.13(d)(2)(i)(b) (first-class certificates); 14 C.F.R. § 67.15(d)(2)(i)(b) (second-class certificates); 14 C.F.R. § 67.17(d)(2)(i)(b) (third-class certificates).

7. 14 C.F.R. § 67.13(e)(1)(i) (first-class certificates); 14 C.F.R. § 67.15(e)(1)(i) (second-class certificates); 14 C.F.R. § 67.17(e)(1)(i) (third-class certificates).

8. 14 C.F.R. § 67.13(e)(1)(ii) (first-class certificates); 14 C.F.R. § 67.15(e)(1)(ii) (second-class certificates); 14 C.F.R. § 67.17(e)(1)(ii) (third-class certificates).

9. 14 C.F.R. § 67.13(f)(1) (first-class certificates); 14 C.F.R. § 67.15(f)(1) (second-class certificates); 14 C.F.R. § 67.15(f)(1) (third-class certificates).

Regulations also specifically provide that the special issue procedures are not available to pilots, co-pilots, or flight engineers who possess any of the nine absolutely disqualifying conditions. 14 C.F.R. § 67.19(d). The discretion here granted to the Federal Air Surgeon insures that the employment interests of capable airmen are fully protected; however, limitations on that discretion including the absolutely disqualifying conditions and the procedures that must be followed by the Federal Air Surgeon, are clearly set forth.

3. *The Procedures for Issuing, Repealing, or Amending the Medical Regulations.*

The provisions of the Administrative Procedure Act are applicable to the rules issued by the FAA, and they form the third, and final, integral part of the Three-Point Plan for Insuring Air Safety. When a rule is issued, amended, or repealed the Administrative Procedure Act and the Regulations require, at a minimum, that the agency publish a general notice of proposed rule making in the Federal Register and that the agency give interested persons an opportunity to comment upon the proposed rule. 5 U.S.C. § 553; 14 C.F.R. § 11.21(b). The FAA received over one hundred comments in connection with the 1959 amendment specifying the nine absolutely disqualifying conditions. 24 Fed.Reg. 7310 (1959).

B. The Defendants' Departures from the Three-Point Plan for Insuring Air Safety

The record in this case reveals three areas in which defendants have allegedly departed from the Three-Point Plan for Insuring Air Safety, and they will be discussed seriatim.

1. *The Defendants issue medical certificates to airmen with absolutely disqualifying conditions.*

The first departure from the Three-Point Plan for Insuring Air Safety is that the defendants issue medical certificates to airmen with absolutely disqualifying conditions. The Federal Air Surgeon receives between 800 and 900 applications each year from airmen seeking "exemptions" from the medical standards. The majority of these applications are made by airmen with absolutely disqualifying conditions. Pursuant to this court's order of December 7, 1978, the defendants produced all the exemption files (a total of 60) of airmen with absolutely disqualifying conditions who had been granted functionally limited first class certificates. Although not required to do so by the order, the defendants produced some, but not all, of the files for airmen with absolutely disqualifying conditions who have been granted unrestricted medical certificates. Defendant Reighard testified by deposition that the defendants grant medical certificates to thirty to thirty-five percent of all "exemption" applicants with histories of myocardial infarction and thirty percent of all "exemption" applicants with angina pectoris. In certain instances the defendants have certified airmen with multiple absolutely disqualifying conditions.

Upon receipt of an application for an exemption, the matter is referred to a group of consultant medical specialists who recommend a decision to the Federal Air Surgeon. The Federal Air Surgeon makes the final decision based upon a summary prepared by the medical consultants which sets forth the nature of the case and a brief summary of their rationale. The consultant medical specialists appear to be a vestige of the "Medical Advisory Panel" which was established in 1960 by 14 C.F.R. Part 11 as an advisory group to the Administrator. The Medical Advisory Panel was officially disbanded in 1966, but the consultant medical specialists continue to perform services for the Federal Air Surgeon. (The role played by this advisory panel is not challenged in these proceedings.)

A relatively recent notice of a proposed amendment to 14 C.F.R. Part 11 indicates that the Federal Air Surgeon currently receives approximately 100 petitions for "exemptions" per month. 43 Fed.Reg. 52204 (1978). The applications have grown from as few as 200 per year in the early 1960's, to 350 in 1971, to a present rate of 800–900 per year. The granting of "exemptions" from the various medical conditions, including

those which are absolutely disqualifying, has progressed from a relative rarity to a situation where thirty-five percent of all applicants are granted "exemptions." This increase in the grant of "exemptions" correlates directly with the transfer of the "exemption" authority from the Administrator to the Federal Air Surgeon in 1971.

2. *The Defendants issue medical certificates with limitations that specify the function the airman may perform in the cockpit.*

The second departure from the Three-Point Plan for Insuring Air Safety is that the defendants place conditions on medical certificates of the type referred to herein as "functional limitations," which specify the job an airman may hold in a cockpit, such as "not valid for pilot-in-command duties," "valid for first officer duties only," or "valid for flight engineer duties only." These "functional limitations" are readily distinguishable from the "operational limitations" which are expressly authorized by 14 C.F.R. § 67.19(c). (The latter, instead of specifying job functions, specifies conditions which would operate to compensate for a medical deficiency, *e. g.*, requiring corrective lenses or requiring that a pilot with nightblindness fly only in the daytime.) The operational limitations are specifically provided for in the Regulations and by the explicit language of 14 C.F.R. § 67.19(d) do not apply to airmen with any of the absolutely disqualifying conditions.

"Functional limitations" are not actually "limitations" but are an administrative mechanism to allow an airman to obtain a first-class medical certificate even though the Federal Air Surgeon has determined that he is medically unfit to perform the duties attendant to such a certificate. Frequently, such a "limitation" on a first-class certificate indicates that the certificate is "not valid for pilot-in-command duties," but, by reason of its facial designation as "first-class," the airman may serve as a first officer or second officer aboard a commercial air carrier even though the air carrier deems it safer that all of its crewmembers possess the level of health attendant to

a first-class medical certificate unencumbered by any restriction.

These "functional limitations" are designed by defendant Reighard "with the knowledge that that person might be used by the air carrier as a substitute pilot for a pilot flight deck crewmember [who has] become incapacitated or otherwise unable to perform pilot flight deck duties," and notwithstanding the fact that "[a]ll cockpit procedures are alternated between the right [the first officer's] and left [the captain's] hand seats on alternate take-offs and landings."

In granting such functionally limited medical certificates, defendant Reighard purports to determine the specific duties for which an airman is qualified and to give consideration to the specifications of airplanes. However, the designation of cockpit function is not a medical consideration. Defendant Reighard does not require that his consultant medical specialists acquaint themselves with cockpit environments. Reighard testified that "as to a specific procedure or a process by which I make an effort to specifically inform myself as to the total operation of a flight crew, I have no regular periodic or specific procedure for this purpose."

These medical certificates are issued by the Federal Air Surgeon under the aegis of his "exemption" authority and the "special issue" procedures, since there is nothing in the Act or the Regulations which specifically permits such limitations.

As mentioned previously, the defendants may exempt airmen with absolutely disqualifying conditions if such exemption would be in the public interest and would not adversely affect air safety. 49 U.S.C. § 1421(c); 14 C.F.R. § 11.25(b)(5). However, under the second point in the Three-Point Plan for Insuring Air Safety, the defendants can "waive" certain medical requirements without making any finding as to the public interest.

A detailed procedure is set forth in 14 C.F.R. § 67.19 for the special issuance of medical certificates to airmen, other than those with absolutely disqualifying condi-

tions, who do not meet the medical standards. The Federal Air Surgeon receives approximately 1000 applications each year for "special issue" medical certificates, and a significant number of such certificates granted contain "functional limitations" of the type discussed above. Pursuant to this court's order of December 7, 1978, the defendants produced twenty-one files representing airmen who have been issued functionally limited medical certificates pursuant to 14 C.F.R. § 67.19. An examination of the record reveals that these limitations are often the result of a type of "plea bargaining" undertaken to secure an airman's employment and that the special testing and evaluation requirements of the section are rarely performed.

3. *Defendants have adopted the practices here at issue without notice to or an opportunity for comment from interested parties*

The third departure from the Three-Point Plan for Insuring Air Safety is that defendants have adopted all of the practices outlined above without notice to or an opportunity for comment from interested parties.

When the Regulations specifying the absolutely disqualifying conditions were initially proposed and submitted for rule making in 1959, defendant Reighard reviewed the public comments in his capacity at that time as Chief of the Medical Standards Division of the Office of the Civil Air Surgeon. Defendant Reighard continues to believe that "those medical conditions were of such a nature that the predictability of non-reoccurrence could not be accurately measured," and defendant Reighard has never proposed that the Regulations be amended.

In granting medical certificates to airmen with absolutely disqualifying conditions, defendant Reighard nevertheless purports to make individualized judgments based upon medical techniques and knowledge that have come to his attention subsequent to 1959 but which have not been incorporated into the Regulations. Similarly, in granting functionally limited medical certificates, the Federal Air Surgeon purports to make individualized judgments concerning the cockpit duties for which an airman is qualified based upon informal information concerning crew member positions which has not been incorporated into the Regulations.

Defendant Reighard's position with respect to myocardial infarction provides an example of the change that has taken place. Defendant Reighard testified: "The information available at the time that condition was made one of the totally disqualifying conditions was that taking all myocardial infarctions that had occurred, the probability of another infarction was some eight to 10 times greater than for persons of similar ages who had not had a myocardial infarction." The Federal Air Surgeon even now believes "it is possible for the condition known as myocardial infarction to result in the sudden incapacitation of an individual," and he testified that he continues to believe that myocardial infarction should be an absolutely disqualifying condition. Nevertheless, the Federal Air Surgeon has formulated a detailed set of written guidelines for the issuance of medical certificates to airmen with cardiovascular disorders, including myocardial infarction, evidenced by the document "Cardiovascular Evaluation Specifications," attached as Appendix A. This document has never been published in the Federal Register.

In November 1976 the FAA issued a document entitled "Alcoholism and Airline Flight Crewmembers." That document contains the following information: "Between 1960 and 1971, there were eight petitions for air transport pilots for exemption from the alcoholism standard. None were granted. Between 1972 and 1975, there were twenty-one such petitions of which fourteen exemptions were granted. As of September 1, there have been twenty-one exemptions for Class I granted in 1976, with one exemption denied. This is a reflection of changing policy. . . ." This "changing policy" has never been published in the Federal Register, nor has the FAA invited public comments about the change. It is action such as this that Delta contends constitutes improper rulemaking on the part of the defendants.

## II. DISCUSSION OF LEGAL ISSUES

Although the parties may place different emphasis on the facts given above (or reach different conclusions based upon different analyses of the facts), the material facts are not in dispute. Finding no genuine issue of material fact, the court concludes that summary judgment, pursuant to Rule 56, Federal Rules of Civil Procedure, is appropriate. The voluminous pleadings, exhibits, and other material submitted to the court in this case can be distilled to the sole issue of whether the defendants, in issuing medical certificates to airmen with any of the absolutely disqualifying conditions, and in placing functional limitations on said certificates, have been acting beyond or contrary to the authority given them by the Federal Aviation Act, the Department of Transportation Act, and the Federal Aviation Regulations. A careful review of the statutes, legislative history, regulations, and case law convinces this court that the defendants have been acting improperly and that Delta's motion for summary judgment should be granted.

### A. Background of the Medical Regulations

To provide a framework for the discussion of the FAA's actions with respect to the absolutely disqualifying conditions it is necessary to look at the development of the Regulations and how they relate to the policy behind the Federal Aviation Act ("Act"). The basic, fundamental policy woven throughout the Act and Regulations is to promote "safety of flight of civil aircraft." 49 U.S.C. § 1421(a). To this end, the Act requires that in prescribing rules and regulations "the Administrator shall give full consideration to the duty resting upon air carriers to perform their services with the highest possible degree of safety in the public interest" and that the "Administrator shall exercise and perform his powers and duties under this chapter in such manner as will best tend to reduce or eliminate the possibility of, or recurrence of, accidents in air transportation." 49 U.S.C. §. 1421(b). Courts have repeatedly recognized that the Congressional objective of safety permeates the Act and that the fostering of safe air travel was the primary motive in enacting 49 U.S.C. § 1421. *See Starr v. FAA*, 589 F.2d 307 (7th Cir. 1978), *Rauch v. United Instruments*, 548 F.2d 452 (3d Cir. 1976), *Gabel v. Hughes Air Corp.*, 350 F.Supp. 612 (C.D.Cal.1972). The president's message transmitting his proposal for the creation of the FAA also reflects this concern: "Recent midair collisions of aircraft, occasioning tragic losses of human life, have emphasized the need for a system of air traffic management which will prevent, *within the limits of human ingenuity*, a recurrence of such accidents." H. Doc. 406, 85th Cong., 2d sess., reprinted in [1958] U.S.Code Congressional and Administrative News, pp. 3741, 3742 (emphasis added).

Of key concern to Congress in fostering air safety was the health of the pilots. In 1956, the Civil Aeronautics Administration (predecessor to the FAA) contracted with the Flight Safety Foundation, Inc. ("FSF"), a non-profit organization with expertise in aviation safety, to conduct an evaluation of the then current medical standards. The FSF issued its report on March 31, 1958, and that report was the precipitating factor and basis for the Regulations adopted on September 11, 1959. These regulations, which became effective on October 15, 1959, continue in effect in substantially the same form today as Part 67 of the Federal Aviation Regulations. The FSF study made numerous recommendations, including one which suggested that the possession of certain physical conditions would disqualify an airman from obtaining any medical certificate. The notice of the promulgation of the Regulations commented on these recommendations as follows:

This report makes recommendations as to changes in medical standards in several areas. Of these recommendations the most important deal with three medical areas:

(1) Individuals with an established diagnosis of diabetes requiring insulin or other hypoglycemic agents for treatment;

(2) Individuals with a history of myocardial infarction or other evidence of coronary artery disease; and

(3) Individuals with a history of an established diagnosis of psychosis, severe psychoneurosis, severe personality abnormality, epilepsy, chronic alcoholism or drug addiction.

The Foundation recommends, in effect, that existence of any of the conditions in these three categories is an appropriate basis for disqualification for any class of medical certificate. This recommendation is based on the medical fact that none of these three conditions can be so precisely studied in the individual as to provide assurance that they will not interfere with the safe piloting of aircraft. In reality, *the likelihood of occurrence of partially or totally incapacitating states directly attributable to these conditions is so great, and the ability to provide acceptable medical assurance of nonoccurrence of such states in any given individual is so inadequate, that these conditions existing in airmen constitute a definite hazard to safety in flight.*

The recommendations of the Foundation were made on the basis of consideration of these conditions by leading professional groups and individuals in appropriate medical specialities. Additionally other professional groups were asked to comment on the Foundation's recommendations and the proposed amendments. The comments reflected concurrence with the recommendations and agreement with the principles expressed therein, as more fully discussed hereinafter.

The Administrator agrees with these recommendations and on the basis of expert medical opinion believes that they are well founded in medical fact.

24 Fed.Reg. 7309 (1959) (emphasis added).

### B. Exemption from the Regulations

■ The FSF study recommended, and the Regulations as adopted provide, that the Administrator shall have the authority to grant exemptions "from any rule issued by the Federal Aviation Administration." 14 C.F.R. § 11.25(a). This authority is limited only by the requirement that the exemptions be "in the public interest." 14 C.F.R. § 11.27(b). By the plain wording of the regulation, the Administrator can grant exemptions to airmen possessing any of the absolutely disqualifying conditions, and this court so holds. However, the court further holds that any exemption granted must be done with strict adherence to the FAA's own regulation that the exemption be "in the public interest." This requirement assures that the objective of the Act and the Regulations (to promote air safety) will not be defeated and further assures that the Regulations themselves will not be rendered meaningless by virtue of constant and *pro forma* exemptions. *See Utah Agencies v. CAB*, 504 F.2d 1232 (10th Cir. 1974), and *Island Airlines, Inc. v. CAB*, 363 F.2d 120 (9th Cir. 1966), wherein the courts noted that exemptions should be used sparingly and only in very limited and unusual circumstances.

■ This court finds that the defendants have been improperly granting exemptions in two very significant ways: (1) the grants of exemption routinely recite that they are "in the public interest" with no supporting facts whatsoever for that determination and (2) the Federal Air Surgeon has totally misconceived what is meant by the "public interest."

It is basic to judicial review of administrative actions that the agency "must find what the statute [or regulation] requires it to find, not in conclusory fashion in the statutory language but in such fashion that a reviewing court can test the validity of the finding." *American Airlines, Inc. v. CAB*, 235 F.2d 845, 853 (D.C. Cir. 1956). "The necessity for administrative agencies to provide a statement of reasons, especially in cases . . . where the public interest demands close scrutiny of agency action, is a fundamental principle of administrative law." *Brooks v. Atomic Energy Commission*, 476 F.2d 924, 926–27 (D.C. Cir. 1973). *See also SEC v. Chenery Corp.*, 332 U.S. 194, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947).

Mere recitation that a grant of exemption is in the public interest gives the court no basis by which to judge the FAA's action and falls far short of the requirement of

*Chenery* that the basis for an agency's decision must be set forth with such clarity that the court is not left to speculate as to the theory, rationale, or facts underlying the agency's determination. For the FAA to grant an exemption to the medical standards promulgated in the Regulations it must specify why such exemption is in the public interest.

More fundamental is the fact that the FAA completely misunderstands what is meant by the term "public interest." The following excerpts from the deposition testimony of Defendant Reighard are quite revealing:

Q. Dr. Reighard, I can understand how it could be in the interest of this individual for you to do what you did; but I am asking you—how is it in your interest, our Reporter's interest, my interest and the other Members of the public to do what you did; how did you make that determination?

A. The best I can respond is that we are a Public Service Regulatory Agency with a considerable obligation to respond to every citizen who requests of us a Privilege which we have the power to grant.

The obligation that we feel very strongly is that each citizen who makes such a request is entitled to our most careful deliberation as to his request and if by any means any reasonable means attaching any conditions or limitations as we may see fit, we can grant that Privilege without sacrificing aviation safety in our judgment; we have an obligation to do so.

. . . . .

Q. Hypothetically, though, would it be appropriate to make that [*i.e.*, changes in the employment requirements of the airman's employer] a part of your decision-making process?

A. Technically; no. It must be understood that *the client we must serve is the petitioner* who states his request and provides supporting information in pursuit of his request.

*Our client, in all such matters, is always the Petitioner and no other party.*

. . . . .

Our decision has to do with help [*sic*; whether] or not using the criteria set forth in Part II; *the client before us is entitled to the Exemption which he requests.* We are not unknowing as to his employment status in most cases, however. (Emphasis added.)

■ The court finds this perception of whom the FAA serves to be utterly astonishing. That the Federal Air Surgeon can seriously believe that his client is the individual airman is beyond the grasp of this court. The Federal Air Surgeon's "client" is now, and always has been, the public. And for a proper understanding of who the public is, the FAA and the Federal Air Surgeon need go no farther than the FSF study of 1958:

The public was interpreted as all individuals who might be exposed to an aircraft that crashes: passengers, crew, and those on the ground. The CAA and the commercial operators have a definite obligation to protect the public; they should do everything possible to assure the general public that the crew is competent both physically and professionally. *This obligation and responsibility outweigh the responsibility to the individual pilot,* especially if the pilot is known to have a heart condition that could be crippling. (FSF study at 107) (emphasis added).

The Federal Air Surgeon and the FAA should never equate an individual airman with "the public" (as they apparently are doing now) and thus rationalize that whatever is good for that airman is necessarily good for the public. Likewise, if the Federal Air Surgeon and the FAA perform their jobs in a way that simply serves the individual as he attempts to obtain either his medical or airman certificate, they are acting not only beyond the regulatory authority given them under the Act but are acting contrary to their own Regulations and the Act itself. This is easily recognized when it is remembered that the Act's very purpose

is to promote air safety and to require the air carriers "to perform their services with the highest possible degree of safety in the public interest." [10] Exemptions which are merely in the private, economic interest of the individual airman may not be granted, since exemptions may not be used simply for the "alleviation of personal hardship cases." *Starr v. FAA*, 589 F.2d 307, 312 (7th Cir. 1978). The rationale for this holding has been succinctly stated by the Fifth Circuit: "It is well known that there is very little second chance given to one who loses control of an aircraft, particularly during critical periods of flight. Any regulation involving physical standards will cause a certain number of people to be deprived of their privilege of flying but abolition of the criteria would cause risk to the public far in excess of any benefit to the individual." *Day v. National Transportation Safety Board*, 414 F.2d 950, 953 n.2 (5th Cir. 1969).

For the foregoing reasons the court holds that the practice of the FAA in granting exemptions which are merely in the private interest of the individual airman is totally improper and that the use of *pro forma*, boiler plate language stating that these exemptions are "in the public interest" does not cure this defect.

C. Limitations Placed on Grants of Exemption and Special Issue Certificates

■ Although, as discussed earlier, the Federal Air Surgeon gives unrestricted grants of exemption from the medical regulations, he will often place some kind of functional limitation on the certificate that is issued pursuant to the grant. These same functional limitations are also occasionally placed on special issue certificates that are issued pursuant to 14 C.F.R. § 67.19. These limitations restrict the posi-

tion which the airmen can hold in the cockpit and typically read "not valid for pilot-in-command duties," "valid for first officer duties only," or "valid for flight engineer duties only." The court finds the imposition of the functional limitations to be improper, since the Administrator has not delegated to the Federal Air Surgeon the authority to impose such limitations.

Under 49 U.S.C. § 1422(b) the Administrator is authorized to issue airman certificates specifying the capacity in which the holders thereof are authorized to serve as airmen in connection with aircraft and these certificates may contain "such terms, conditions, and limitations as to duration thereof, periodic or special examinations, tests of physical fitness, and other matters as the Administrator may determine to be necessary to assure safety in air commerce." These provisions relate only to airman certificates and do not refer to the possibility of such limitations being contained in the medical certificate (which is a requisite for obtaining the airman certificate).

By virtue of 14 C.F.R. § 67.25, the Administrator has delegated to the Federal Air Surgeon his authority under 49 U.S.C. § 1422 "to issue or deny medical certificates" to the extent necessary to

(1) Examine applicants for and holders of medical certificates for compliance with applicable medical standards; and

(2) *Issue, review, or deny* medical certificates to applicants and holders based upon compliance or noncompliance with applicable medical standards. (Emphasis added.)

It is axiomatic that a subordinate can have no more authority than that delegated to him, and the above-cited regulation gives

---

**10.** That the FAA misunderstands its duty is apparent from a publication of its Office of Aviation Medicine, wherein it noted that of 800 appeals and petitions for exemption about 125 would be granted. The publication then goes on to note: "The valid question might be whether we are endangering safety in denying so few. The answer has been given. Limitations help control the *level of risks* taken. We must tailor our decisions to the individual." Federal Aviation Administration, *The Philoso-* *phy and Limitations of the FAA Aeromedical Certification Standards, Policies and Procedures* at 3 (1971) (emphasis added). By the very wording of the Act, the FAA is not to consider the "level of risks" but is to perform its job so that the "highest degree of safety" is maintained. Congress has never authorized the FAA to balance the fate of the flying public against the economic hardships of an individual airman.

the Federal Air Surgeon no authority to impose any kind of limitation on the medical certificate. (The only "limitation" allowed is the designation of whether the certificate will be first, second, or third class, and this is based upon compliance with the "applicable medical standards" for each class of certificate.)

Although under 14 C.F.R. § 67.19 the Federal Air Surgeon may impose "operational limitations" in certain situations, those limitations relate only to procedures by which the applicant can be enabled to perform his duties (*e.g.*, pilot must wear corrective lenses, or pilot with night-blindness may pilot an aircraft only during daylight hours). The regulation does not even purport to allow the Federal Air Surgeon to designate what duties an airman may or may not perform in cockpit, and yet this is precisely what the Federal Air Surgeon has been doing. This court firmly believes that such action should not continue. The court notes that in placing functional limitations on the medical certificates the Federal Air Surgeon is, in effect, usurping the authority of the air lines to designate the duties of its employees. The Federal Air Surgeon is conceivably hindering the air lines' compliance with the safety mandate of 49 U.S.C. § 1421(b). The Regulations provide minimum standards for achieving air safety, and the air lines in many instances have gone beyond the minimum standards, *e.g.*, requiring that the first officer and the flight engineer have first class medical certificates when the Regulations require only the pilot-in-command to have such a certificate. The practical result of the Federal Air Surgeon's imposing functional limitations is to lower the standards imposed by the air lines to the bare minimum required by the Regulations. The court does not believe that the air lines should be hampered in their attempts to perform their services "with the highest possible degree of safety."

Additionally there is some evidence in the record that the Federal Air Surgeon does not always conduct the tests required by 14 C.F.R. § 67.19 before granting the special issue certificate. However, this evidence may reflect only an untypical lapse on the part of the Federal Air Surgeon, and the court is not prepared to make a specific finding of improper conduct in this area. Of course, if Delta (or any other air line) can show that the Federal Air Surgeon is not, as a matter of course, complying with the testing requirements of this regulation, it can seek an appropriate injunction.

D. Procedures for Issuing, Repealing, or Amending the Regulations

■ ALPA vigorously argues that changes in medical technology since the Regulations were adopted in 1958 warrant the action of the defendants in granting exemptions and imposing functional limitations on the grants of exemption. The court recognizes that tremendous strides have been made in the treatment of cardiovascular problems, alcoholism, psychoses, etc., since 1958. These advancements may even warrant a change in the medical standards; however, if any such change is made, it must be done within the proper regulatory framework.

Under 5 U.S.C. § 553(b), any proposed change in the Regulations must be published in the Federal Register so that the public can be given the opportunity to comment on the proposed change. (Such a requirement is especially important when, as in the instant case, it is the public who is directly affected by the Regulations.) The record in the case *sub judice* provides clear evidence that the defendants have effectively amended the Regulations by issuing *pro forma* exemptions and placing functional limitations on medical certificates, allegedly based upon this perception of the advance in medical technology. Whether these changes can be made and the goal of the Act and Regulations to promote air safety to the highest degree possible still be served is not an appropriate inquiry for the court at this time. The response to that question will undoubtedly come from members of the public, who will have the opportunity to comment if the FAA desires to legitimate its "change in policy" by complying with the Administrative Procedure Act.

### III. CONCLUSION

For the foregoing reasons, Delta's motion for summary judgment is GRANTED;

ALPA'a motion for summary judgment is DENIED. The defendants are hereby enjoined from issuing medical certificates to airmen possessing any of the absolutely disqualifying conditions enumerated in 14 C.F.R. §§ 67.13, .15, .17 and are enjoined from exempting any airman from these provisions without a proper finding that such exemption is in the public interest as elucidated in this opinion. The Federal Air Surgeon is further enjoined from placing any limitation on the medical certificate of an airman that describes the flight functions that such airman may perform.

APPENDIX "A"

## DEPARTMENT OF TRANSPORTATION FEDERAL AVIATION ADMINISTRATION

### CARDIOVASCULAR EVALUATION SPECIFICATIONS

These specifications have been developed by the Federal Aviation Administration (FAA) to determine an applicant's eligibility for airman medical certification. Standardization of examination methods and reporting is essential to provide sufficient basis for making this determination and the prompt processing of applications. This cardiovascular evaluation, therefore, must be reported in sufficient detail to permit a clear and objective evaluation of the cardiovascular disorder(s) with emphasis on the degree of functional recovery and prognosis. It must be performed by a specialist in internal medicine or cardiology and should be forwarded to the FAA immediately upon completion. Inadequate evaluation or reporting, or failure to promptly submit the report to the FAA may delay the certification decision. As a minimum, the evaluation must include the following:

**I. MEDICAL HISTORY.** Particular reference should be given to cardiovascular abnormalities—cerebral, visceral, and/or peripheral. A statement must be included as to whether medications are currently or have been recently used, and if so, the type, purpose, dosage, duration of use and other pertinent details must be given. A specific history of any anticoagulant drug therapy is required. In addition, any history of hypertension must be fully developed and if thiazide diuretics are being taken, values for serum potassium should be reported. A comment should be included on any important or unusual dietary programs.

**II. FAMILY, PERSONAL, AND SOCIAL HISTORY.** A statement of the ages and health status of parents and sibling is necessary; if deceased, age at death and cause should be included. Also, an indication of whether any near blood relative has had "heart attacks," hypertension, diabetes or known disorders of lipid metabolism must be provided. Smoking, drinking and recreational habits of the applicant are pertinent as well as whether a program of physical fitness is being maintained. Comments on the level of physical activities, functional limitations, occupational and avocational pursuits are essential.

**III. RECORDS OF PREVIOUS MEDICAL CARE.** If not previously furnished to the FAA, a copy of pertinent hospital records as well as out-patient treatment records, with clinical data, x-ray and laboratory observations and copies of or original serial EKG tracings, should be provided. Detailed reports of surgical procedures as well as cerebral and coronary arteriography and other major diagnostic studies are of prime importance.

**IV. GENERAL PHYSICAL EXAMINATION.** A brief description of any comment-worthy personal characteristics; height, weight, representative blood pressure readings in both arms; funduscopic examination of retinal arteries; condition of peripheral arteries; carotid artery auscultation; heart size; rate; rhythm and description of murmurs (location, intensity, timing, and opinion as to significance) and other findings of consequence must be provided.

**V. LABORATORY DATA.** As a minimum, must include actual test values of:

A. Routine urinalysis and complete blood count.

B. Blood chemistries (values and normal ranges of the laboratory).

1. Serum cholesterol and triglycerides after 12- to 16-hour fast.

2. Blood uric acid after 12- to 16-hour fast.

3. Fasting blood sugar. If the fasting blood sugar is elevated, include at least a three-hour glucose tolerance test following glucose loading for the three preceding days.

4. Blood urea nitrogen.

5. Protein-bound iodine, if indicated, and reports of any other diagnostic studies which may have been recently performed.

C. Recent PA and lateral chest x-rays (provide films if abnormal).

D. Electrocardiograms.

1. Resting tracing.

2. Exercise stress test.

a. State methodology used.

b. Provide blood pressure determinations at rest, at each stage of the exercise stress test, and during the recovery period.

c. Submit representative EKG tracings for the control, exercise and recovery periods.

d. Obtain recovery EKG tracings until there is a return to the control configuration and/or until the control level of heart rate has been achieved.

NOTE: The information obtained through a determination of current cardiovascular capacity and an evaluation of strain end points under the stress of rhythmic exercise is considered essential to the determination of fitness of any applicant with suspected or known cardiovascular disease. Current practice indicates that a stress test on a treadmill, using either Bruce or Balke protocol, is optimum in providing the desired performance data. Alternatively, an ergometer test that results in a degree of work of approximately 85 percent of the age-predicted maximum capacity using heart rate end points is acceptable. All usual medical precautions should be followed in prescreening, election to test, testing, and follow-up on applicants who undergo exercise stress testing. The resting tracing should be reviewed by the examining physician for evidence of acute coronary insufficiency, recent myocardial infarction, or repolarization abnormalities. EKG evidence of recent, unsuspected myocardial change or infarction would contraindicate exercise testing. Please state reasons if the exercise stress test is medically contraindicated.