**D. Ross BEINS, Appellant,**

v.

**UNITED STATES of America.**

**No. 81–1978.**

United States Court of Appeals, District of Columbia Circuit.

Argued June 4, 1982.

Decided Dec. 7, 1982.

Daniel U. Smith, San Francisco, Cal., for appellant.

John W. Polk, Royce C. Lamberth, Asst. U.S. Attys., Washington, D.C., were on the brief for appellee. Stanley S. Harris, U.S. Atty., Washington, D.C., entered an appearance for appellee.

Before ROBINSON, Chief Judge, LUTHER M. SWYGERT,* Senior Circuit Judge, United States Court of Appeals for the Seventh Circuit, and WALD, Circuit Judge.

Opinion for the Court filed by Circuit Judge WALD.

Concurring Opinion filed by Chief Judge SPOTTSWOOD W. ROBINSON, III.

WALD, Circuit Judge:

The plaintiff-appellant, D. Ross Beins, appeals a judgment of the district court for the government under the Federal Tort Claims Act (FTCA).[1] We find the district court with one exception applied the proper law, did not err in its finding of no negligence, and did not commit reversible error by limiting an expert witness' testimony; accordingly, we affirm.

## I. FACTUAL BACKGROUND

This case involves the Federal Aviation Administration's (FAA) denial to a pilot, on five separate occasions, of an airman medical certificate, which he needed to resume his career as a commercial airline pilot.[2]

---

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 28 U.S.C. §§ 1346(b), 2671 et seq.

2. Our recitation of facts is drawn largely from the district court's memorandum opinion. See Beins v. United States, No. 79–3322 (D.D.C. Aug. 5, 1981), reprinted in Appendix (App.) at 1 [hereinafter cited as District Court Opinion].

### A. *FAA Medical Certification Procedures*

Some understanding of the FAA certification procedures is necessary to follow appellant's path through the application process.[3] The Federal Aviation Act directs the Administrator of the FAA to investigate each airman to insure that he "possesses proper qualifications for, and is physically able to perform the duties pertaining to, the position for which the airman certificate is sought." 49 U.S.C. § 1422(b). In carrying out this duty, the Administrator requires a pilot to obtain a medical certificate as a condition to the issuance of an airman's certificate (which also certifies aviation skills). The Administrator has delegated, pursuant to 49 U.S.C. § 1344(d), statutory authority pertaining to medical certification to the Federal Air Surgeon. 14 C.F.R. § 67.25 (1982).

The FAA issues medical certificates in three classes. The Federal Aviation Regulations set forth in detail the medical standards for each class of certificate. *See* 14 C.F.R. §§ 67.13, .15, .17 (1982). A captain of a commercial aircraft must have a first-class medical certificate, and a copilot or flight engineer must have at least a second-class certificate. *See id.* §§ 61.3(a), .3(c), .23, .123(c), .139, .151(e), .171, 63.3(a), 121.437(a)–(b). A third-class medical certificate will allow an airman to fly only as a private pilot. *See id.* § 61.103(c).

In most cases, the applicant for a medical certificate begins the process with an examination by a private physician who has been designated by the Air Surgeon to serve as an aviation medical examiner (AME). *See id.* § 67.23. The AME examines the applicant's medical history and his current condition to determine whether he meets the medical standards set forth in the regulations. If the AME denies the certificate, the applicant has thirty days to petition the

Air Surgeon for reconsideration. *Id.* § 67.-27(a). The Air Surgeon will often send an applicant's file to expert consultants prior to making a final decision. A denial by the Air Surgeon or by certain other FAA officials is considered a denial by the Administrator, *id.* § 67.27(b), and is appealable to the National Transportation Safety Board (NTSB), 49 U.S.C. § 1422(b).

An applicant who fails to meet the medical standards may petition the Air Surgeon for a "special issue" certificate. 14 C.F.R. § 67.19 (1982). In these cases, the regulations give the Air Surgeon discretion to offer a special flight, test, or evaluation to determine whether the airman can perform his duties without endangering safety in air commerce. In acting on a petition for a "special issue" certificate, the Air Surgeon relies on the recommendation of a panel of consultant medical specialists. At the time of the events in this case, the special issue procedures were not applicable to pilots, copilots or flight engineers who suffered any of nine disqualifying conditions. *Id.* § 67.-19(d). Certain neurological problems were disqualifying, but a failure to meet the specific neurological standards cited by the Air Surgeon in his denials of appellant's applications, *see id.* §§ 67.13(d)(2)(ii), .15(d)(2)(ii), .17(d)(2)(ii), was not. Appellant also does not have normal fields of vision, which are required for a first or second-class certificate, but which have not been an absolute prerequisite to authorization under the special issue procedure.[4]

### B. *Appellant's Applications for Medical Certification*

Appellant, D. Ross Beins, began flying for United Air Lines in December 1966. He held a first-class airman medical certificate from 1966 through April 29, 1971. When appellant reapplied at that time for a first-class certificate the FAA declined to act until it could evaluate his hospitalization on

---

**3.** *Delta Air Lines, Inc. v. United States,* 490 F.Supp. 907 (N.D.Ga.1980), contains an extensive discussion of both the FAA's medical certification process and the background of its medical standards for pilots.

**4.** As a last resort, an applicant with a disqualifying condition could ask the Administrator to exempt him from the regulation. The Administrator may grant an exemption from any rule or regulation "if he finds that such action would be in the public interest." 49 U.S.C. § 1421(c).

May 8, 1970, for what appeared to have been a generalized seizure.

Physicians involved in appellant's case—then and since—have disagreed about the precise cause of the 1970 incident, and these differences have played a critical role in their conflicting views on both appellant's later hemorrhage in 1974 and his overall fitness to be a pilot. Appellant was taken to the hospital early in the morning on May 8, 1970, after his wife, noticing that he was perspiring heavily and shivering, was unable to wake him. Appellant remained in the hospital for five days. The examining neurologist described appellant as having a tonic-clonic contraction. The treating physician wrote in appellant's discharge summary that the patient had suffered a "syncopal episode of excessive muscle contractions; amnesia; stridulous breathing; etiology undetermined." *Beins v. United States,* No. 79–3322 (D.D.C. Aug. 5, 1981) mem. op. at 2, *reprinted in* Appendix (App.) at 1, 2 [hereinafter cited as District Court Opinion].

Nonetheless, on October 15, 1971, after evaluating the 1970 incident, the FAA issued appellant a first-class medical certificate with operational restrictions. On October 5, 1972, the FAA granted appellant an unlimited first-class medical certificate. The FAA renewed the unlimited certificate for 1973 and 1974.

On November 19, 1974, appellant suffered a spontaneous intracerebral hemorrhage. The major symptom of appellant's hemorrhage was loss of his entire right field of vision in both eyes. Appellant's physicians promptly placed him in a hospital and administered an arteriogram (an X-ray photograph of arteries). The arteriogram showed one vascular malformation in the left rear of the brain, and suggested another smaller one in the left front region.

Dr. S.R. Winston performed a craniotomy on appellant. He removed a blood clot that was about two and a half inches inside the occipital lobe (located in the left rear of the brain). Dr. Winston also took out a smaller subdural hematoma (a swelling containing blood close to the brain surface) in the same area. Since Dr. Winston did not perform surgery in other regions of the brain, he could neither confirm nor deny the existence of other vascular malformations. In his summary diagnosis, however, Dr. Winston mentioned a possible left frontal microangioma (a small tumor composed chiefly of blood vessels) and a suspect right parietal (upper posterior wall) microangioma. After surgery, appellant had only a fifty percent field of vision on his right side. This improved in the following months, until by June 1975 his loss was only twenty-five to thirty percent. His condition appears to have stabilized at that point.

On November 11, 1975, appellant applied to an AME for a first-class airman medical certificate. After denial by the AME, appellant requested reconsideration by the Federal Air Surgeon. Appellant gave the FAA the hospital records relating to the surgery in 1974, medical documentation of the improvement in his field of vision, and authorization forms for the release of other information. Prior to acting on appellant's application, the Air Surgeon sought the opinion of Dr. Sam Hunter, a neurosurgeon and an FAA consultant. Dr. Hunter recommended denial. On March 25, 1976, the Air Surgeon denied appellant's application. The Air Surgeon's letter to appellant explained that the decision was based on appellant's intracranial hemorrhage and surgery, which resulted in a visual field defect, and appellant's current use of anticonvulsant medicine. Appellant did not appeal the Air Surgeon's denial to the NTSB.

On August 30, 1976, appellant applied again for an airman medical certificate, but this time he sought only a third-class rating. The Air Surgeon once more consulted Dr. Hunter, who again recommended denial. On March 10, 1977, the Air Surgeon denied appellant's application because: "(1) he had had an intracerebral hemorrhage requiring surgery; (2) he had a visual field defect; (3) there was a continued risk of post-operative seizures; and (4) diagnostic studies revealed the presence of other vascular malformations, presenting the risk of further bleeding episodes." District Court Opinion

at 4. Appellant again did not appeal this decision to the NTSB.

On June 20, 1977, appellant petitioned the FAA for an exemption from a neurological requirement, 14 C.F.R. § 67.17(d)(2)(ii) (1982), and for the issuance of a third-class airman medical certificate. The Air Surgeon referred appellant's file to Dr. Thomas Auth, a neurologist and an FAA consultant. Dr. Auth concluded that appellant should not be certified for four reasons: a persisting electroencephalogram (EEG) abnormality in the left temporal lobe; risk of seizures; risk of rebleed; and the visual field defect. The Air Surgeon then forwarded appellant's petition and file to a panel of consultants. The panel also recommended against certification, and on August 31, 1977, the Air Surgeon denied appellant's request for an exemption. Appellant did not appeal to the NTSB.

In December 1977 appellant underwent an extensive physical examination, including a second arteriogram and a CAT Scan. The arteriogram was normal. The CAT Scan revealed an area of atrophy where the blood clot had been removed. Dr. Benjamin Boshes, the examining neurologist selected by appellant, reviewed these tests and others and concluded that appellant was not qualified for certification. Dr. Boshes believed that the ongoing spiking activity on the EEG's over a period of seven years indicated a risk of seizure.

On April 21, 1978, appellant once again requested a first-class certificate. The Air Surgeon consulted Dr. Harold Stevens, a neurologist who is board-certified in electroencephalography. Dr. Stevens reviewed a report on the December 1977 CAT Scan, the reports of the various EEG's, and the medical records pertaining to the 1970 and 1974 incidents. Dr. Stevens concluded that appellant's request for certification should be denied because of both a pattern of abnormal EEG's and the surgical scar in his brain. Dr. Stevens believed that the scar was a potential epileptogenic focus that presented a risk of seizure. On July 7, 1978, the Air Surgeon denied this fourth request for certification. The Air Surgeon's denial cited appellant's seizure disorder in 1970 and the scar from the hemorrhage and surgery in 1974. The Air Surgeon stated that the scar and the manipulation of the brain enhanced the probability of future seizures. Appellant did not appeal to the NTSB.

Appellant made his final application to the Air Surgeon for a first-class certificate on August 21, 1978, within two months of the fourth denial. The Air Surgeon denied the request on September 11, 1978. The Air Surgeon noted the same two reasons he had given in the previous denial, and added that appellant continued to have a visual field defect.

Appellant appealed this fifth denial to the NTSB. On February 19, 1980, after a hearing, the Administrative Law Judge found that appellant had met his burden of proving that he met the safety standards for third-class certification. He concluded: "Though Petitioner may not be entirely beyond the realm of some risk of future seizure activity, in view of his medical history, his age, and the absence [of] subsequent seizure activity and the relevant time duration thereof, it is the judgment here that such risk is minimal." Defendant's Exhibit No. 1 at 83–84.

The FAA appealed the Administrative Law Judge's decision to the NTSB. After a hearing de novo, the NTSB affirmed the initial decision on October 17, 1980.[5] On January 22, 1981, the Air Surgeon made a special issuance of a second-class certificate to appellant, thereby permitting him to resume work as a commercial pilot.

5. The NTSB concluded:

In sum, the Board concludes that the record supports the finding that the 1970 event was caused by insecticide poisoning and that petitioner does not have a seizure disorder; that the risk of a future subarachnoid hemorrhage is within acceptable limits for a third-class airman medical certificate; that the cause of petitioner's 1974 subarachnoid hemorrhage has been adequately explored by Board-certified neurologists and a neurosurgeon thereby reducing the likelihood of a rebleed; and that petitioner's visual defect is not at issue in this proceeding. Plaintiff's Exhibit No. 12 at 14.

Appellant filed this action for damages under the FTCA on December 7, 1979, after his hearing before the Administrative Law Judge, but before the Administrative Law Judge reversed the FAA's denial of appellant's petition for certification. Appellant alleged that the FAA had negligently denied him airman medical certificates on five occasions, thereby preventing him from working as a commercial airline pilot. In particular, appellant claimed that the FAA had negligently failed to provide adequate information to its consultants, and failed to use and analyze appropriate medical evidence in its own evaluations. The government moved to dismiss and later moved for summary judgment on the ground of lack of subject matter jurisdiction because (1) the courts of appeals have exclusive jurisdiction to review orders of the FAA, and (2) the claim was barred by the "discretionary function" exception to the FTCA.[6] These motions were denied without opinions. After a nonjury trial[7] on June 15–17, 1981, the district court issued a memorandum opinion containing the court's findings of fact and conclusions of law. The district court concluded that "plaintiff has not proven negligence and has not proven a case under the Federal Tort Claims Act," and entered judgment for the government. District Court Opinion at 11–12.

## II. JURISDICTION AND EXHAUSTION OF REMEDIES

█ The government presses its objection on appeal that the district court lacked subject matter jurisdiction because the courts of appeals have exclusive jurisdiction under the Federal Aviation Act to review orders of the FAA. See 49 U.S.C. § 1486(a). The appellee contends that since the Administrator has delegated part of his statutory authority with respect to airman certification to the Air Surgeon, 14 C.F.R. § 67.25 (1982), the Air Surgeon's decisions not to issue appellant a certificate were orders reviewable only by the courts of appeals pursuant to 49 U.S.C. § 1486(a).[8] The government is concerned that appellant's assertion of FTCA jurisdiction in district court permitted him to secure a trial *de novo* on the Air Surgeon's determinations. Appellant's exclusive judicial remedy, the government contends, is review on the record before the Air Surgeon to see if his findings are supported by substantial evidence.

We reject the government's contention that there is no subject matter jurisdiction under the FTCA in this case. On its face the FTCA provides a remedy for negligent acts of government employees; none of the several explicit exceptions in the FTCA exempts negligent acts solely because the legal validity of the employee's actions is appealable on other grounds to other administrative bodies or eventually to the courts through the Administrative Procedure Act (APA). See 28 U.S.C. §§ 1346(b), 2680. Nor does this case fall under a judicially established exemption such as the one the Supreme Court created in *Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950).[9] And we can find no

---

**6.** 28 U.S.C. § 2680(a).

**7.** Cases brought under the FTCA are tried to the court sitting without a jury. *See id.* § 2402.

**8.** The government's assertion that the Federal Air Surgeon's decision not to issue a medical certificate is an order reviewable by the courts of appeals appears to be supported by 14 C.F.R. § 67.27(b)(2) (1982), which states that a denial of a medical certificate "[b]y the Federal Air Surgeon is considered to be a denial by the Administrator under [49 U.S.C. § 1422] of the Act." The Administrator is authorized to issue and deny airman certificates by 49 U.S.C. § 1422. According to 49 U.S.C. § 1486(a), "[a]ny order, affirmative or negative, issued by the Board or Administrator under [the Federal Aviation Act], except any order in respect of any foreign air carrier subject to the approval of the President . . . , shall be subject to review by the courts of appeals . . . ." Under 49 U.S.C. § 1422(b), the NTSB also has authority to review the denial of an airman certificate, and is not bound by findings of fact of the Administrator. *See id.* § 1903(a)(9). The NTSB's order is subject to review by the courts of appeals. *See id.* § 1903(d).

**9.** In *Feres,* the Supreme Court held that "the Government is not liable under the Federal Tort Claims Act for injuries to servicemen where

compelling reason in the circumstances of this case to forge, on our own and at this late date, a new exception not provided for by Congress along the lines argued by the government. As the Supreme Court stated in *Indian Towing Co. v. United States,* 350 U.S. 61, 68, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955), "The [FTCA] was the product of nearly thirty years of congressional consideration and was drawn with numerous substantive limitations and administrative safeguards." The Court went on to specify these limitations and safeguards:

> (For substantive limitations, see § 2680(a)–(m). For administrative safeguards, see § 2401(b) (statute of limitations); § 2402 (denial of trial by jury); § 2672 (administrative adjustment of claims . . .); § 2673 (reports to Congress) [later repealed]; § 2674 (no liability for punitive damages or for interest prior to judgment); § 2675 (disposition by federal agency as a prerequisite to suit when claim is filed); § 2677 (compromise); § 2679 (exclusiveness of remedy).)

350 U.S. at 68, 76 S.Ct. at 126 (footnote omitted). This extensive list reflects considerable care by Congress in crafting when and how the FTCA would be available to a claimant; given this detailed statutory scheme, we are disinclined to add a jurisdictional exception or, as discussed below, another exhaustion prerequisite.

Moreover, it is obvious that an appeal under the APA will not provide any remedy in damages, while the prime purpose of the FTCA is to compensate victims of negligent government conduct.[10] In addition, an administrative appeal determines whether the agency action was in excess of statutory jurisdiction and authority, without observance of procedure required by law, contrary to constitutional right and power, arbitrary and capricious, or otherwise not in accordance with law, 5 U.S.C. § 706; these determinations are distinct conceptually from a finding of negligence, the linchpin of the FTCA. For these reasons, we find no bar to subject matter jurisdiction in this case.[11]

■ Our finding of jurisdiction is not necessarily the end of the government's ar-

---

the injuries arise out of or are in the course of activity incident to service." 340 U.S. at 146, 71 S.Ct. at 159.

**10.** *See Indian Towing,* 350 U.S. at 68–69, 76 S.Ct. at 126–127, where the Court stated:
> The broad and just purpose which the statute was designed to effect was to compensate the victims of negligence in the conduct of governmental activities in circumstances like unto those in which a private person would be liable and not to leave just treatment to the caprice and legislative burden of individual private laws.

**11.** The government relies heavily on *City of Rochester v. Bond,* 603 F.2d 927 (D.C.Cir.1979), as authority for the proposition that the district court lacked subject matter jurisdiction in this case. In *City of Rochester* we decided that appellants, who objected to a radio antenna tower, could not file suit in the district court to set aside a "no hazard" determination by the FAA and a construction permit issued by the Federal Communications Commission (FCC). We found that Congress assigned exclusive jurisdiction to review orders of the FCC and FAA to the courts of appeals. *See* 603 F.2d at 934–37. *City of Rochester* is distinguishable from this case because an appeal from the FAA's order would not have led to review of the negligence issue before the district court, nor could it have resulted in an award of damages.

In *City of Rochester,* appeal of the FCC's and the FAA's orders to the court of appeals would have provided an adequate means of reviewing appellants' allegations in the district court suit, *see* 603 F.2d at 936, *i.e.,* that the FAA failed to fulfill a notice requirement, violated the Federal Aviation Act and certain regulations, and together with the FCC, violated the National Environmental Policy Act of 1969. But in this case an appellate review would not have examined the allegation of negligence; it would only review the FAA's certification denial to see if it was arbitrary and capricious, and supported by substantial evidence. *See* 5 U.S.C. § 706. The appellants in *City of Rochester* sought a remedy, setting aside the permits, that the court of appeals could have granted under the APA. Here, however, the appellant seeks a damage remedy, which he could not have received after an APA review regardless of the timeliness of his petition. Finally, as we noted in *City of Rochester,* 603 F.2d at 931, Congress is ordinarily assumed to intend special statutory review procedures to be the exclusive means of obtaining judicial review for the cases to which they apply. But here, Congress specifically established the FTCA to provide a plaintiff with monetary damages for negligent government action.

gument. The government's objections may also be construed as assailing appellant's failure to exhaust his administrative remedies under the APA before initiating suit under the FTCA.[12] Any failure on appellant's part to exhaust the appeals process for the FAA denials would not, of course, necessarily be jurisdictional. As we stated recently, in a case under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621–634, the "exhaustion requirements are *not* jurisdictional in nature but rather are statutory conditions precedent to the instigation of litigation." *Kennedy v. Whitehurst*, 690 F.2d 951 at 961, slip op. at 21 (D.C.Cir.1982) (emphasis in original).

In this case we cannot find an express requirement in either statute or case law that the appellant had to appeal the FAA's denial of medical certification to the NTSB before he could initiate his FTCA action, nor any reason why we should now imply one. We acknowledge that a claim that the certification process was performed negligently might conceivably involve issues similar to those necessary to decide whether the certificate should have been denied. In addition, a successful administrative appeal would permit the appellant to return to work and so limit the extent of his damages. An administrative appeal could not, however, provide the damages remedy that appellant seeks here. It also would not address the question of negligence that appellant presses under the FTCA. Therefore, three of the standard benefits of requiring exhaustion of administrative remedies—permitting the agency to build a record on the issue for decision, to apply its expertise, and possibly to avoid judicial intervention through a finding for the complainant [13]—would have limited, if any, application here. And the problem of bypassing agencies, *see McKart v. United States*, 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969), is not present because the claimant cannot receive medical certification through the FTCA action.

The propriety of imposing any extra exhaustion hurdle on an FTCA claimant is also placed in question by the FTCA's own exhaustion requirements. The FTCA requires claimants to notify the appropriate federal agency of their claims, and establishes a six month waiting period after notice, to provide the government time in which to make an administrative determination. 28 U.S.C. § 2675(a). Moreover, there is a two year statute of limitations on claims under the FTCA. *Id.* § 2401(b). The delay necessitated by waiting for the outcome of an appeal to the NTSB might place a tort action outside the FTCA's own filing deadline. Indeed, in the one instance in this case where appellant did avail himself of the administrative process, that process took two years and four months, from the FAA's fifth denial on September 11, 1978, to the Air Surgeon's issuance of a second-class certificate on January 22, 1981.

There are, of course, ways in which a district court can accommodate an overlapping FTCA claim and an administrative appeal of a certification denial. If a district court believes that the results of an appeal of an adverse certification decision . would be important to the FTCA action, it can stay the FTCA case pending the outcome. And the district court might well take into account a plaintiff's failure to appeal the denial in the calculation of a damage award, *i.e.,* the district court might

---

12. Appellant did not appeal the Air Surgeon's first four denials of appellant's requests for certification. After the fifth denial, appellant appealed to the NTSB, which granted him a third-class certificate. The FAA moved quickly, after the NTSB decision, to reassess appellant's qualifications, and the Air Surgeon made a special issuance of a second-class certificate in about three months. Appellant therefore had no reason to seek judicial review of the NTSB order, since he was able to resume commercial flying. Thus, at a minimum, even under an exhaustion requirement, appellant may claim damages for the twenty-eight month period he was exhausting administrative remedies (between the FAA's fifth denial and the Air Surgeon's favorable determination).

13. *See McKart v. United States,* 395 U.S. 185, 193–95, 89 S.Ct. 1657, 1662–63, 23 L.Ed.2d 194 (1969) (discussing these three general purposes for the exhaustion doctrine).

conclude that damages for lost salary should take account of the likelihood that the plaintiff could have received his airman certificate earlier through a timely appeal.

In short, an absolute requirement of exhaustion of APA administrative remedies, prior to initiating an FTCA suit, would be at odds with the FTCA's integrated statutory scheme, would not serve the purposes of exhaustion because the administrative action would focus on neither the negligence issue nor the damages remedy, and could preclude the FTCA action altogether under the FTCA's own statute of limitations. In this case, therefore, we find that appellant's failures to appeal the first four denials of a medical certificate do not affect the district court's authority to determine, nor our authority to review, the merits of his FTCA action.

### III. THE DISCRETIONARY FUNCTION EXEMPTION

■ The government also argues that the United States is immune from suit because this case falls within 28 U.S.C. § 2680(a), the "discretionary function exception" to the FTCA, which states:

> The provisions of this chapter and section 1346(b) of this title shall not apply to—
>
> (a) Any claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

The "discretionary function exception" to the FTCA has been the focus of much litigation and the subject of many opinions. Following the Supreme Court's broad but somewhat opaque construction of the exception in *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), many courts, including our own, have endeavored to apply the guiding distinction

between "planning" and "operational" duties. *See, e.g., Sami v. United States*, 617 F.2d 755, 765–66 (D.C.Cir.1979) ("operational" duties outside the exception even though they "inevitably require[ ] judgment and discretion"). We recognize, however, that labels like "operational" and "planning" are elastic. *See Blessing v. United States*, 447 F.Supp. 1160, 1173 n. 19 (E.D. Pa.1978).

One discernible theme in the myriad cases interpreting the discretionary exception, however, is to "hold[ ] the government responsible for any negligent execution of admittedly discretionary policy judgments where the decisions required for the execution did not themselves involve the balancing of public policy factors." *Sami*, 617 F.2d at 766. *See also Blessing*, 447 F.Supp. at 1179 n. 28 (discussing and listing cases involving policy formulation and execution with regard to regulatory activity). In *Sami* we quoted a conclusion drawn in *Blessing*,[14] that the policy of the exception was to "'prevent[ ] tort actions from becoming a vehicle for judicial interference with decisionmaking that is properly exercised by other branches of government,'" and that the exception applies only where "'the question is not negligence but social wisdom, not due care but political practicability, not reasonableness but economic expediency. Tort law simply furnishes an inadequate crucible for testing the merits of social, political, or economic decisions.'" 617 F.2d at 766–67 (quoting 447 F.Supp. at 1170). *Accord Hitchcock v. United States*, 665 F.2d 354, 363 (D.C.Cir.1981) (acts and omissions not discretionary because "little or no public policy involved in the State Department's failure to ensure that the vaccine program . . . inform Mrs. Hitchcock that the vaccine was recommended, not required").

We also have the benefit of the experience of other courts which have grappled with the applicability of the discretionary

---

**14.** The court in *Blessing* induced this conclusion from an exhaustive survey of discretionary function cases. Over the course of 19 pages, the court provided yeoman's service by cataloging myriad cases and synthesizing their analyses into a few important propositions on the discretionary function exception. 447 F.Supp. at 1167–86.

function exemption in settings analogous to this case. In *Hendry v. United States*, 418 F.2d 774, 780–84 (2d Cir.1969), the court faced what it described as a "hybrid medical-administrative decision." The *Hendry* court held that the discretionary function exception did not preclude jurisdiction over an allegation that a negligent psychiatric examination performed by employees of the U.S. Public Health Service led the Coast Guard to suspend a Merchant Marine officer's license. In reaching this conclusion, the *Hendry* court acknowledged that "[n]o very clear rule emerges from either the licensing or the malpractice [discretionary function] cases." *Id.* at 782. It noted, however, that the basic distinction was evident enough: The courts will conclude a decision is discretionary where the grant of a license requires an official to balance several factors without reliance upon any readily ascertainable rule, and will find a grant to be nondiscretionary when the task involves matching facts against a clear standard. But in practice, the court continued, the application of this distinction slips into an "intuitive judgment as to the difficulty of the administrative medical decision involved." *Id.* The court warned that "a distinction based solely on the difficulty of a decision would seem to confuse the existence of discretion . . . with the substantive question of whether due care was lacking and how demonstrably it was lacking." *Id.* It feared that such a course would broaden the exemption too far to exclude all but the clearest cases of negligence and thereby unduly limit access to the courts at a time when the government has increasing impact on citizens' lives. *Id.*

The *Hendry* court proposed three factors to assist in evaluating whether discretion exists for FTCA exemption purposes. First, one determines whether the complaint assails a rule formulated by an agency or only the way in which a rule is applied. Second, the court noted that the higher the place in the government hierarchy of the person whose judgment is in question, the more likely that the official's decision involves the type of discretion contemplated by the FTCA's exception. Third, the language of the statute or regulation governing the decision may be relevant, insofar as it indicates that action is required if certain set standards are met or only instructs the decisionmaker to balance certain general considerations. *See* 418 F.2d at 782–83.

Portions of the *Hendry* analysis were used by the district court in *Duncan v. United States*, 355 F.Supp. 1167 (D.D.C. 1973). The core facts of *Duncan* parallel this case. The plaintiff in *Duncan* was a commercial pilot who sought damages under the FTCA for the alleged negligence of the FAA in failing to reissue him an airman medical certificate.[15] He had successfully appealed the denial to the NTSB, and had been restored to flying status. The plaintiff claimed damages for the period between the date he was denied the certificate after the FAA's review of his medical reports, and the date of the NTSB's decision in his favor.[16] One ground upon which the government moved to dismiss the complaint was that the FAA's refusal to reissue a medical certificate constituted the exercise of a discretionary function. *Id.* at 1168–69.

The court in *Duncan* ruled that the government would be liable if the decision on the pilot's application for a certificate was negligently performed. *Id.* at 1170. Relying on *Hendry,* the court focused on

**15.** The pilot in *Duncan* also claimed that the United States interfered with his "prospective economic advantage." The district court held that this assertion fell within 28 U.S.C. § 2680(h), which expressly excepts from the scope of the FTCA any claim arising out of "interference with contract rights." 355 F.Supp. at 1169–71.

**16.** In *Duncan,* the FAA had also revoked the pilot's medical certificate because he had failed to furnish certain requested medical information. The pilot later submitted the requested information to the NTSB, which then dismissed the FAA's complaint. After reviewing the medical reports the pilot submitted, the FAA denied the pilot recertification. The pilot appealed to the NTSB once more, and won again. The pilot's claim for damages was based only on the later denial of certification, not on the earlier revocation decision.

the distinction between the formulation and application of rules. It noted that the Administrator exercised his statutory powers, 49 U.S.C. §§ 1354(a), 1355, to make regulations and create standards for the issuance of airman certificates, without doubt a policy-making determination. But the Administrator had also decided, pursuant to his authority, to delegate the function of examining and testing persons for medical certificates to the Federal Air Surgeon, aviation medical examiners, and FAA staff. *See* 49 U.S.C. §§ 1355(a), 1422; 14 C.F.R. § 67.25 (1982). The court found that these delegates were performing the nondiscretionary task of matching individual facts to clear standards promulgated by the Administrator. 355 F.Supp. at 1170. Indeed, the court stressed, the Administrator's regulations on medical certification stated that "any applicant 'who meets the medical standards prescribed in this part, based on medical examination and evaluation of his history and condition, is *entitled* to an appropriate medical certificate.'" 355 F.Supp. at 1169 (emphasis added) (quoting 14 C.F.R. § 67.11). The court concluded that an applicant who meets the standards set forth by the Administrator has a legal right to the medical certificate. 355 F.Supp. at 1169.

The *Duncan* court also explained why it was particularly concerned that the discretionary function exemption not be used in that case "to effect a mantle of protection for negligent action." *Id.* at 1170. The Administrator's regulations, the court pointed out, not only carried out his responsibility to promote air safety—they also effectively determined the livelihood of commercial airline pilots. This double effect imposed an "added burden" upon the government: "If the government assumes the responsibility of regulating the commercial air pilot occupation in furtherance of its 'end-objective' of securing air safety, it must do so in a careful manner." *Id.*

We agree with the court in *Duncan* that the FAA's refusal to issue an airman medical certificate to a qualified applicant does not necessarily constitute the exercise of a discretionary function, and thus does not preclude our jurisdiction under the FTCA.

Nevertheless, since many courts have held "[v]arious licensing determinations ... [to be] discretionary rather than operational within the meaning of § 2680(a)," *Hendry*, 418 F.2d at 780, we must examine closely the specific FAA medical licensing regulations involved in this particular case to see whether the FAA had "discretion" within the terms of § 2680(a) to grant a medical certificate. Specifically, we must see whether the regulations instructed the FAA officials to weigh certain medical abnormalities and left a range of policy judgment as to whether to grant a license, or whether the officials were simply required to match these deficiencies against a clear medical standard contained in the regulations. Basically, if the FAA's regulations allowed the Air Surgeon the discretion to grant a medical certificate after weighing certain public policy concerns that would also permit him to deny the certificate, his judgment would constitute an exercise of discretion not covered by the FTCA. *See* 28 U.S.C. § 2680(a).

The FAA's regulations on "Medical Standards and Certification" are found at 14 C.F.R. § 67 (1982). The history of the standards reveals a careful effort to safeguard the public by establishing detailed and rigorous tests that all qualified pilots must meet. In 1956, the Civil Aeronautics Administration (the predecessor to the FAA) contracted with the Flight Safety Foundation, Inc. (FSF), a non-profit group with expertise in aviation safety, to evaluate the existing medical standards. The FSF's recommendations relied on the evaluations of leading professional groups and individuals in appropriate medical specialties. The FSF's report of March 31, 1958, precipitated the adoption of new regulations on September 11, 1959, which continue in effect today in substantially the same form. *See Delta Air Lines, Inc. v. United States,* 490 F.Supp. 907, 915–16 (N.D.Ga.1980).

The regulations begin by establishing a class of applicants to whom medical certificates *shall be* issued:

An applicant who meets the medical standards prescribed in this part, based on medical examination and evaluation of history and condition is *entitled* to an appropriate medical certificate.

14 C.F.R. § 67.11 (1982) (emphasis added). Like the court in *Duncan,* we find the language of entitlement to be significant: If the applicant meets the medical standards, he must be given a certificate—at that point in the certification process the FAA's decision is not discretionary.[17] We also note that § 67.11 imposes a duty on the FAA to base its decision on a medical examination and evaluation of the applicant's history and condition.

The next sections of the regulations establish the particular medical standards for first, second, and third-class certificates. *See id.* §§ 67.13, .15, .17. Some of the standards appear to leave little or no discretion of any kind to the FAA. For example, under § 67.13(b)(2), to meet the vision qualifications for a first-class certificate an applicant must have "[n]ear vision of at least v = 1.00 at 18 inches with each eye separately, with or without corrective glasses." Other standards can be read to require medical judgment, but not the balancing of competing policy concerns associated with a discretionary decision. For example, § 67.-13(e)(1)(i) requires an applicant for first-class certification to have "[n]o established medical history or clinical diagnosis of [m]yocardial infarction." We believe that the vision standards noted in the denials in this case, "[n]ormal fields of vision," *id.* §§ 67.13(b)(4), .15(b)(3) (first and second-class certificates) and "[n]o serious pathology of the eye," *id.* § 67.17(b)(2) (third-class certificate), fall in this second category. These standards require the FAA to evaluate a medical condition, not to weigh and balance conditions such as the effect of the vision problem on the pilot's ability to perform his duties safely. Therefore, we con-

clude that the determination of whether appellant met the vision medical qualifications relied on by the FAA in its denials did not involve a discretionary decision within the meaning of 28 U.S.C. § 2680(a).

Finally, we note that some medical standards do require the FAA to balance a medical judgment with a calculation of whether the applicant's medical condition permits him to perform his duties safely. We believe that the neurological standard on which the FAA relied in denying appellant's applications falls within this third group. The standard is the same for all three classes of certification. The applicant may not have any:

other convulsive disorder, disturbance of consciousness, or neurologic condition that the Federal Air Surgeon finds—

(a) Makes the applicant unable to safely perform the duties or exercise the privileges of the airman certificate that he holds or for which he is applying; or

(b) May reasonably be expected, within 2 years after the finding, to make him unable to perform those duties or exercise those privileges;

and the findings are based on the case history and appropriate, qualified, medical judgment relating to the condition involved.

14 C.F.R. §§ 67.13(d)(2)(ii), .15(d)(2)(ii), .17 (d)(2)(ii) (1982). This language requires the Air Surgeon to use his medical judgment to determine whether the applicant suffers or has suffered a convulsive disorder, disturbance of consciousness, or neurologic condition. Then he must analyze the scope of any such problem. Finally, the Air Surgeon has to decide whether the condition would make the pilot unable to perform his duties safely at present or within two years. In this case we find that this last step—the determination under this regulation of whether appellant's possible

---

17. The word "entitled" in 14 C.F.R. § 67.11 also reflects the language of 49 U.S.C. § 1422(b), which states in pertinent part: Any person may file with the Administrator an application for an airman certificate. If the Administrator finds, after investigation,

that such person possesses proper qualifications for, and is physically able to perform the duties pertaining to, the position for which the airman certificate is sought, *he shall issue such certificate....* (Emphasis added.)

neurologic problems made him unable to perform his duties or exercise his privileges safely—left the Air Surgeon a range of policy judgment, albeit a narrow one.[18] In making his decision, the Air Surgeon had to evaluate how, and the likelihood that, appellant would have future neurologic problems that could impinge on his performance as a pilot. Then the Air Surgeon had to calculate the possible effects of the problems on air safety. This was not just a matter of testing known medical facts against a clear medical standard. For these reasons, we conclude that the specific determinations of the Air Surgeon about this appellant's neurologic fitness constituted an exercise of discretion under the terms of the exception in 28 U.S.C. § 2680(a).[19]

We hasten to emphasize that our decision in this case does not exempt from FTCA remedies any substandard medical or ad-

**18.** We note that this neurologic regulation's requirement that the Air Surgeon evaluate whether a condition will permit *safe* performance of duties distinguishes it from the exclusively medical standard involved in *Hendry.* The court in *Hendry* stated explicitly that:

> [T]he statute and regulations governing the delicensing procedure do not appear to convey discretion to identify and consider public safety goals. The only discretion apparently contemplated is that inherent in the judgments of any medical doctor in private practice.

418 F.2d at 783. In this case, however, the neurologic standard left the Air Surgeon a limited policy judgment as to whether appellant's medical condition would allow him to perform safely the duties of a commercial pilot. In making his decision, the Air Surgeon was presumably to consider such factors as the responsibilities of a commercial airline pilot, the technology of the aircraft, the demands inherent in the nation's flight traffic system, and the available backup personnel and equipment. This decision was clearly different from one made by "any medical doctor in private practice." For unlike the physician in private practice, "[t]he Federal Air Surgeon's 'client' is . . . the public," and "[s]afety is . . . the hallmark of the airman certification procedures" under which he must operate. *Delta Air Lines, Inc. v. United States,* 490 F.Supp. at 909, 917.

**19.** Thus, as we see it, our only difference with Chief Judge Robinson's concurring opinion relates to whether the Air Surgeon's final determination—that appellant's neurologic condition made him unable to perform his pilot's duties safely—involved any "exercise of judgment or discretion of a public character." Concurring Opinion at 614 (footnote omitted) (quoting *Eastern Air Lines v. Union Trust Co.,* 221 F.2d 62, 74–75 (D.C.Cir.), *aff'd sub nom. United States v. Union Trust Co.,* 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799 (1955)). The concurrence emphasizes that the certification decision in this case involved only the application of *medical* standards, *see* Concurring Opinion at 615–616, and cites numerous medical *treatment* cases for the proposition that "many courts have held that medical decisions by governmental personnel are beyond [the] pale [of

the discretionary function exemption], *id.* at 614 & n. 31. The concurring opinion also states that "a straightforward reading of the regulations confines [the Air Surgeon's] determination to the effect of the applicant's neurologic health on air safety." *Id.* at 616 (footnote omitted).

With due deference, we continue to believe that the Air Surgeon's medical certification decision as "to the effect of the applicant's neurologic health on air safety" was a medical-administrative determination of a *public character.* This is not a medical treatment case involving allegations of malpractice. Instead, it *involves the Federal Air Surgeon, a senior* public official who "is responsible for the application of aviation medicine principles and knowledge for the safety and promotion of civil aviation." FAA Position Description for the Federal Air Surgeon. To discharge his responsibility to help "prevent[ ] aircraft accidents," the Air Surgeon is supposed to research, develop, and implement "medical fitness standards for civil airmen, and [enhance] the bioengineering aspects of aircraft design and aircraft operating procedures," among other duties. *Id.* These are not matters over which private physicians exercise judgment. In this case, the Air Surgeon had to determine whether appellant was neurogically fit to fly members of the public in the nation's air traffic system. This decision does not seem to us to be like that of a physician who determines whether his patient is fit to drive a car.

We agree, of course, that some of the certification standards the Air Surgeon must apply involve only medical judgment. But that does not mean that all medical-air safety evaluations can be reduced to a purely medical standard. In this case, the language of the standard dealing with neurologic capabilities instructs the Air Surgeon to evaluate neurologic conditions of uncertain predictability in light of the requirements of safe performance of duties over time. We must conclude that neurologic problems and their possible effect on air safety are sufficiently problematical so that the standard was drafted to leave the Air Surgeon the discretion to undertake this weighing in a case-by-case manner.

ministrative conduct that took place in the course of the FAA's consideration or evaluation of appellant's neurologic condition.[20] Indeed, the neurologic standard itself contains the requirement we already discussed, 14 C.F.R. § 67.11 (1982), that the FAA base its decision on the medical record. It states that the Air Surgeon's findings must be "based on the case history and appropriate qualified medical judgment." *Id.* §§ 67.-13(d)(2)(ii), .15(d)(2)(ii), .17(d)(2)(ii). What we are classifying as discretionary is only the Air Surgeon's final judgment, based on the medical evaluation, that the applicant is "unable to safely perform the duties . . . of the airman certificate." *See id.*

As a consequence, many of appellant's allegations of negligence are not excluded from judicial review under the discretionary function exception. Although the trial judge encountered some difficulty in obtaining from plaintiff's counsel a satisfactory specification of the particular duties breached, *see* Trial Transcript (Tr.) at 253–70, our understanding is that the alleged negligence consisted of: (1) failing to provide complete and accurate materials to experts whom the FAA asked to analyze and report on appellant's condition; (2) failing to base denials of certification on an accurate evaluation of appellant's current case history and condition; and (3) failing to apply accurately the experts' reports and the FAA's evaluations of appellant's condition to the certification standards. Our application of the discretionary function analysis just discussed to this case would not exclude the first and second types of allegations, nor the third insofar as the complaints related to the vision standards. However, the exemption does foreclose appellant's allegations that the Air Surgeon

and his staff were negligent in applying professional findings (such as the EEG reports, evaluations of seizure potential and risk of rebleed, and analyses of the cause of the hematoma) to the question of whether appellant could perform his pilot duties safely. We turn next to those allegations of negligence not excluded by 28 U.S.C. § 2680(a).

### IV. THE NEGLIGENCE CLAIM

The district court found "that the Air Surgeon was not negligent in denying plaintiff's applications for airman medical certificates and that all such denials were based on substantial evidence and [were] entirely reasonable." District Court Opinion at 9–10. We will not disturb that finding unless it is "clearly erroneous." *McAllister v. United States,* 348 U.S. 19, 75 S.Ct. 6, 99 L.Ed. 20 (1954); *Daniels v. Hadley Memorial Hospital,* 566 F.2d 749, 756 n. 49 (D.C.Cir.1977). As the Supreme Court noted, "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). "Thus, a trial court's finding will not be permitted to stand where it is based on a serious mistake as to the effect of evidence or is clearly contrary to the weight of the evidence." *Daniels,* 566 F.2d at 757.

It is important first to pinpoint precisely what actions appellant claims constituted negligence. First, the acts challenged are those of the Federal Air Surgeon, FAA employees, and other U.S. Government personnel. As plaintiff conceded at trial, he is not attributing to the FAA any possible

---

**20.** *Cf. Payton v. United States,* 679 F.2d 475, 482–83 (5th Cir.1982) (en banc), where the court in an FTCA action parsed a statute providing for the hospitalization of mentally ill prisoners and found an operational, non-discretionary function, the examination of inmates, preceded a discretionary decision, the placing of an inmate in an institution. In the course of discussing a separate provision, the court also noted that an ultimate decision of the Parole Board to release a prisoner could be held dis-

cretionary while intermediate acts, like failing to forward requested material records to Board members, could be found sufficiently separable from the final decision on release to be held non-discretionary. *Id.* at 482 n. 6. *But cf. id.* at 483–87 (Tjoflat, J., dissenting) (the purposes of the "discretionary function exception" are frustrated by recognizing "jurisdiction of a claim based on an act antecedent to a discretionary act").

negligence of FAA consultants or independent contractors. Tr. at 11. Second, the FAA's disputed actions involved the medical-administrative process by which the Air Surgeon made his decisions not to award the appellant a medical certificate. Third, as best we can parse his claims, the alleged negligence by the government personnel consisted of their: (1) failing to provide complete and accurate materials to experts whom the FAA asked to analyze and report on appellant's condition; (2) failing to base denials of certification on an accurate evaluation of appellant's current case history and condition; and (3) failing to apply accurately the experts' reports and the FAA's evaluations of appellant's condition to the certification standards.

█ Looking first at the allegations that the FAA failed to send necessary materials to its expert consultants, we agree with appellant that the FAA's actions appeared at times less than confidence-inspiring. As detailed below, however, we conclude that the district court's finding that they did not rise to the threshold of actionable negligence is not "clearly contrary to the weight of the evidence."

A prime complaint of appellant is that the Air Surgeon sent Dr. Hunter, one of his consultants, only the reports of the pre-surgery arteriogram instead of the films themselves. But as the district court pointed out, "Dr. Hunter was satisfied with the reports and did not request the actual films." District Court Opinion at 10. Dr. Hunter testified that he did not feel he needed to examine the films, and that it was customary in the field of neurosurgery to rely on the reports of qualified radiologists. Tr. at 353–54. The FAA could reasonably have expected Dr. Hunter to ask for the arteriogram films if the reports were insufficient.

Similarly, appellant attacks the failure of the FAA to send Dr. Stevens the CAT Scan films. The district court found that Dr. Stevens' normal practice was to rely on the radiologist's report of the CAT Scan, as he had in this case, and that Dr. Stevens did not change his medical opinion even after

he saw the films. District Court Opinion at 11. In fact, Dr. Stevens stated at the trial that the films supported his opinion as to appellant's lack of suitability for certification. Tr. at 397–98.

Finally, appellant alleges that the FAA provided the consultant group that considered his petition for exemption in 1977 with a "working paper" summary that contained inaccurate information. Appellant first complains that the summary termed his 1970 incident a seizure episode and then omitted mention of his recertification in 1971. Although the FAA would be advised to take greater care in identifying conflicting analyses when preparing such summaries, we find no evidence that the consultant panel was led astray. Appellant's frustration with the conflicting explanations of the 1970 event is understandable, but we note that no single interpretation of the 1970 incident was accepted by all experts, even at the time of trial, see Tr. at 414–15 (testimony of Dr. Stevens), much less in 1977. Appellant's own witness, Dr. Stuart Winston, admitted on cross-examination that he was not sure whether or not appellant had a seizure in 1970. Tr. at 211–13. Furthermore, the panel had a number of other reports and sources of primary evidence on which it could have based its recommendation for denial. Indeed, Dr. Boshes, a member of the panel, wrote in a letter dated February 25, 1978, that the chief reason for the panel's decision was that various EEG tests had shown active discharging foci in appellant's brain. Defendant's Exhibit No. 1 at 182. Even if the panel were in some way misled, the final decision on denial was made by the FAA, and appellant does not allege that the FAA was unaware of his recertification in 1971.

Appellant also complains that the summary the FAA provided the panel contained the false statement that the pre-operative angiogram (arteriogram) was provided to Dr. Hunter. Appellant argues that this misinformation led the panel to give undue weight to Dr. Hunter's opinion, which was based only on reports on the arteriogram. We agree with the district court that

"[t]here is no credible evidence that the panel was misled by Dr. Hunter's opinion letter concerning his assessment of the arteriogram reports." District Court Opinion at 10. The summary also referred the panel to Dr. Auth's report on the arteriogram, which appellant maintains was the correct one because Dr. Auth based it on his examination of the arteriogram films. Moreover, it appears that the panel had the arteriogram films available to it. *Id.* at 10–11. Finally, the error seems inconsequential in light of the fact that even if the panel had relied totally on Dr. Auth's report, ignoring Dr. Hunter's findings, they would have been left with Dr. Auth's bottom-line recommendation that appellant not be given "neurological clearance" because of other problems. *See* Tr. at 291–92 (testimony of Dr. Reighard, quoting from Dr. Auth's report).

■ The appellant's second category of negligence concerns failures by the Air Surgeon and other government personnel to base denials of certification on an accurate evaluation of appellant's current case history and condition. One complaint is that the Air Surgeon's first and second denials were based on Dr. Hunter's inaccurate reference to a one-half field visual loss, when the Air Surgeon's files showed that appellant had only a one-quarter field loss of vision. We do not see how this error makes a difference. Even a one-quarter field loss of vision disqualifies an applicant for first and second-class certificates, and there is at least some question of whether it might be disqualifying, as a "serious pathology of the eye," for third-class certification. Dr. Hunter stated at trial that the distinction between one-half and one-quarter field loss of vision would not have made any difference in his recommendation for denial to the Air Surgeon. Tr. at 364–65. Appellant stresses that the Air Surgeon later told him that his one-quarter field loss of vision was not a major concern, and suggests that the mistake about a one-half field loss cost him certification. We believe, however, that in the context of his overall evaluation of appellant's condition, the Air Surgeon's comment carries a different import: that the

Air Surgeon was far more concerned about appellant's neurological condition than his visual defect. In that event, even if the Air Surgeon had been negligent in his assumptions about the extent of appellant's visual loss, and even if a one-quarter field loss would have been qualifying, we cannot conclude that the error caused the denial of certification.

■ Appellant also argues that the Air Surgeon's first denial referred to appellant's continued use of anti-convulsant medication, and that the Air Surgeon should have known from appellant's medical file that appellant was no longer receiving such medication. We agree that the Air Surgeon's error is troubling, but again we find no evidence that makes us think it made a difference. The Air Surgeon consulted with Dr. Hunter prior to the first and second denials, and Dr. Hunter's testimony makes it clear that his recommendations were based on his analyses of appellant's neurological problems and history. *See* Tr. at 354–56, 370–79. But we can find no reason to believe that the erroneous assumption that appellant required anti-convulsant medicine had much effect on Dr. Hunter's analysis. He did not refer to the medicine in his testimony about his diagnosis. By way of analogy, we note that Dr. Boshes maintained his conclusion that appellant was unfit even after he learned that appellant was off the medication. *See* Tr. at 150–51 (testimony of D. Ross Beins); Defendant's Exhibit No. 1 at 182.

■ Appellant's next objection is that the Air Surgeon ignored appellant's case history and current medical condition when he failed to conclude, at the time of the second and third denials, that appellant did not have vascular malformations. Appellant argues that the arteriogram taken in 1974 revealed this information. Furthermore, appellant believes that Dr. Auth's conclusion that there were no malformations, made prior to the third denial, should have settled the question. Appellant contends that the Air Surgeon's negligence compelled appellant to have another arteri-

ogram in December 1977 to establish the absence of vascular malformations. We sympathize with appellant's struggle to persuade the Air Surgeon that certain expert views should prevail, but we cannot conclude that the Air Surgeon's seeming recalcitrance was due to negligence. Quite simply, the experts disagreed about the presence of vascular dangers. Even appellant's witness, Dr. Winston, admitted at trial that the surgery he performed could neither confirm nor deny whether appellant still had microangiomas. Tr. 222–23. Dr. Winston also testified that he did not feel he could give "the all clear" about the possibility of a microangioma in June 1977, the month appellant applied the third time for certification. See Tr. at 233. Finally, Dr. Winston stated that he did not tell the FAA that he had revised his earlier conclusion (that there were possible microangiomas) to state that he believed that there was no evidence of malformations until March 1978, about seven months after the third denial. See Tr. at 225–26.

Appellant also asserts that the Air Surgeon ignored appellant's actual medical condition when he based the fourth and fifth denials in part on post-surgical scarring, which the Air Surgeon believed enhanced the probability of seizures. Appellant argues that the Air Surgeon should have known that the CAT Scan did not reveal any scar. We believe that the contentions about the presence of the scar are similar to the disagreements about vascular malformations—the reasonable judgments of medical experts on the issue differed. Clearly, Dr. Stevens, the expert with whom the Air Surgeon consulted prior to the fourth and fifth denials, believed that although the CAT Scan did not show a scar, it revealed a condition that would accompany a scar. Dr. Stevens explained that the CAT Scan revealed an absence of circulation of blood in an area of atrophy, and that "the consensus would hold that there is an accompanying scar." Tr. at 401, 403. Dr. Stevens also stated that a cortical scar, such as he believed existed here, is a potential source of epilepsy. Tr. at 408. Appellant's own expert witness, Dr. Winston, admitted

on cross-examination that the destruction of brain tissue, such as occurred here, would leave "some adjacent reparative gliosis," which he also stated some experts would term a scar. Tr. at 238. We believe it would be a mistake to overemphasize a debate about nomenclature, as appellant's argument presses us to do. Whatever the term, the heart of Dr. Stevens' diagnosis was that appellant's condition created a risk of future seizure. We conclude, therefore, that the Air Surgeon reasonably based his denials on appellant's current medical condition when he relied on Dr. Stevens' expert report.

Finally, we review the last category of appellant's allegations of negligence: the government's failure to apply accurately the experts' reports and the FAA's evaluations of appellant's condition to the certification standards. As we discussed above, appellant's allegations pertaining to the application of the neurological standard in this case are precluded by the "discretionary function exemption" of 28 U.S.C. § 2680(a). We do not believe appellant has complained about the FAA's specific act of applying the analyses of his visual condition to the standards. Insofar as he does make allegations about the FAA's treatment of his visual problem, we have already discussed above why any possible errors were inconsequential to the decisions to deny certification.

In sum, we conclude that the district court's finding of no negligence is not "clearly erroneous." This is not to say that we do not find some of the Air Surgeon's practices relating both to provision of medical materials to experts, and to assessment of appellant's current medical condition to be troublesome. That is, in fact, the reason why we have conducted such an extensive review of the medical evidence. However, that review has served to convince us that none of the questionable practices contributed in any material respect to the Air Surgeon's decisions not to certify appellant.

## V. EXCLUSION OF EXPERT TESTIMONY

Appellant also urges reversal because the district court declined to permit one of ap-

pellant's witnesses, Dr. Emil Taxay, to testify as an expert in aviation medicine. Dr. Taxay did testify as an expert in internal medicine.

Fed.R.Evid. 702 lays down a two-part test for the admissibility of expert testimony: the witness must be qualified and he must be capable of assisting the trier of fact.[21] The question of whether these conditions have been satisfied is largely committed to trial court discretion. As the Supreme Court stated in *Salem v. United States Lines,* 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962) (citation omitted), "the trial judge has broad discretion in the matter of the admission or exclusion of expert evidence, and his action is to be sustained unless manifestly erroneous." This court has also stated:

> The qualification of a particular witness to testify as an expert is largely within the domain of the trial judge. Particular inquiries which may be appropriate in some cases may be inappropriate in others. The majority of this court think the matter should be left to the sound judicial discretion of the trial judge, with no more specific guidance than is contained in this opinion.

*Jenkins v. United States,* 307 F.2d 637, 645 n. 19 (D.C.Cir.1962) (en banc). The guidance provided by *Jenkins* includes the following: "a general practitioner may testify concerning matters within a medical specialty if his education or experience, or both, involves demonstrable knowledge of the subject," *id.* at 643 (citation omitted); a skilled witness on a medical subject need not be duly licensed to practice medicine, *id.* at 644; and "if experience or training enables a proffered expert witness to form an opinion which would aid the jury, in the absence of some countervailing consideration, his testimony will be received." *Id.*

[11] This case admittedly skirts the line where our deference to the trial judge gives way to our reading of the rule. The only

evidence we have to support the exclusion of Dr. Taxay's testimony as an expert in aviation medicine comes from his admission at trial that he was not Board certified in aviation medicine. *See* Tr. at 38–39. The government seeks to buttress the denial by noting that Dr. Taxay had not authored any publications in aviation medicine, and that his former designation as an AME had been revoked. Appellee's Brief at 26–27. But neither of these facts is disqualifying per se. Possibly the district judge also thought that Dr. Taxay's testimony would not be of assistance to him in his role as trier of fact. On the other hand, we note that from 1959 to 1963 Dr. Taxay served as an AME for the FAA. He was also a flight surgeon for the Air Force for two years. And Dr. Taxay has assisted pilots in their attempts to regain certification after denials in some 200 cases. Tr. at 31–36.

Fortunately, we do not need to decide whether the district court erred in its refusal to accept his expert qualifications, because we do not find the absence of Dr. Taxay's testimony on aviation medicine to be prejudicial. A summary of the matters on which appellant proffered his testimony includes: (1) how appellant's visual field loss should have been evaluated under good aviation medical certification practice; (2) four good certification practices relating to the inspecting of the arteriograms and the analysis of avascular malformations; (3) whether disqualifying grounds were given in the Air Surgeon's denial letter of March 21, 1976; (4) Dr. Taxay's assessment of the 1974 surgery as of the date of the first denial (March 26, 1976); (5) other physicians' opinions on the possibility that pesticide exposure caused the 1970 incident; (6) whether the FAA's medical file on appellant reflected if the FAA ever asked an expert in internal medicine to evaluate the 1970 incident; and (7) the significance of the Air Surgeon's recertification after the incident. Appellant's Opening Brief at 48–51.

---

21. *Fed.R.Evid.* 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact

in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

We have examined the effect of Dr. Taxay's inability to testify on each of these matters. As to the first item, relating to visual field loss, we note that Dr. Taxay's admitted testimony covered both the effect of appellant's vision loss, see Tr. at 42–45, and how the medical standards in the regulations are applied, see Tr. at 72–73. In addition, we have discussed why we do not believe a possible error by the Air Surgeon on the visual loss issue was determinative of the denial of certification. As to the second area, proper practices relating to the inspection and analysis of the avascular malformations, those practices are a matter of neurologic expertise, not aviation medicine. As discussed above, ample evidence showed that experts reasonably disagreed about the presence and effect of vascular malformations. The third subject, the absence of disqualifying grounds in the first denial letter, hardly seems to require Dr. Taxay's commentary; the letter is part of the record, and it refers to regulations which the court can also examine. The fourth item, Dr. Taxay's assessment of the 1974 surgery at the time of the first denial, would not seem to be prejudicial for the same reasons we gave on the second matter. Dr. Taxay managed to testify in any event on the fifth item, other physicians' opinions on the cause of the 1970 incident. See Tr. at 75–76. Sixth, the question of whether the FAA's file revealed a consultation regarding the 1970 incident with an expert in internal medicine really does not require expert commentary. Finally, Dr. Taxay also testified on the meaning of the FAA's recertification of appellant in 1972. See Tr. at 74–75.

We must conclude, after examining in detail the extensive record and expert testimony in this case, that the exclusion of these supplementary aspects of Dr. Taxay's planned testimony does not amount to prejudicial error. The facts of this case are noticeably different than those in the cases cited by appellant in support of his argument for reversal. In *Kosberg v. Washington Hospital Center*, 394 F.2d 947 (D.C. Cir.1968) (per curiam), a wrongful death claim against a psychiatrist was completely stymied when the trial judge ruled that the physician who was plaintiff's expert witness was not qualified to testify on the standard of care and its violation. Therefore, unlike the case at hand, the trial judge's ruling in *Kosberg* gutted plaintiff's attempt to establish the core elements of the action. Similarly, *Baerman v. Reisinger*, 363 F.2d 309 (D.C.Cir.1966), involved an appeal from a directed verdict in a medical malpractice case against a cardiologist where the excluded testimony from a general practitioner with experience in treating the plaintiff's illness was offered to establish the standard of practice for similar practitioners. Unlike *Baerman*, Dr. Taxay's testimony was not critical to educating the trial court in this case about how regulations should be applied and how the medical-administrative aspects of a certification system should be performed.

Because we do not find clearly erroneous the district court's decision that the government did not act negligently in this case, and because we do not find the district court's limitation of Dr. Taxay's testimony to be reversible error, the judgment of the district court is

*Affirmed.*

SPOTTSWOOD W. ROBINSON, III, Chief Judge, concurring:

I join in the court's judgment and, save on one point, in its opinion. Though I agree on affirmance, I have difficulty with the court's position on the relationship of the discretionary function exemption to neurologic testing in airman medical certification procedures. I thus write to elucidate my approach to questions of application of the exemption, and to explain my grounds for a different outcome thereon.

I

The Federal Tort Claims Act imposes liability in damages upon the United States for the wrongful acts or omissions of its

employees,[1] but subject to a number of exceptions.[2] One, supplied by Section 2680(a), exempts claims "based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."[3] The phrase "discretionary function or duty," however, is much less encompassing than the words themselves might suggest. The mere fact that the employee's responsibilities require some exercise of judgment is not enough;[4] it is discretion of a special kind to which Section 2680(a) speaks. In *Dalehite v. United States,*[5] undoubtedly the leading case on the subject, the Supreme Court explained that Congress, in excepting various types of activity from risk of liability under the Act, exercised care to protect the Government from claims, however negligently caused, that affected the governmental functions."[6] Consonantly, the Court declared, "[t]he 'discretion' protected by the section ... is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law."[7] And, of the steps Congress took "to protect the Government from liability that would seriously handicap efficient government operations,"[8] the Court more recently has labeled Section 2680(a) the "[m]ost important."[9]

A quarter-century ago, when first confronted by the discretionary function exemption, this circuit heeded these teachings.

---

1. "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages...." 28 U.S.C. § 2674 (1976). See also *id.* § 1346(b).

2. See *id.* § 2680.

3. The provisions of this chapter and section 1346(b) of this title shall not apply to—
   (a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused....
   *Id.* § 2680.

4. As the Sixth Circuit has observed, "[j]udgment is exercised in almost every human endeavor. It is not the mere exercise of judgment, however, which immunizes the United States from liability for the torts of its employees." *Downs v. United States,* 522 F.2d 990, 995 (6th Cir.1975) (footnote omitted). See also *J.H. Rutter Rex Mfg. Co. v. United States,* 515 F.2d 97, 99 (5th Cir.1975), *cert. denied,* 424 U.S. 954, 96 S.Ct. 1428, 47 L.Ed.2d 359 (1976); *Smith v. United States,* 375 F.2d 243, 246 (5th Cir.), *cert. denied,* 389 U.S. 841, 88 S.Ct. 76, 19 L.Ed.2d 106 (1967); *Liuzzo v. United States,* 508 F.Supp. 923, 930–931 (E.D.Mich.1981).

5. 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953). The case emanated from an explosion of ammonium nitrate fertilizer produced in a federally-initiated and -controlled program for export to areas under military occupation following World War II.

6. *Id.* at 32, 73 S.Ct. at 966, 97 L.Ed. at 1439.

7. *Id.* at 34, 73 S.Ct. at 967, 97 L.Ed. at 1440 (footnote omitted).

8. *United States v. Muniz,* 374 U.S. 150, 163, 83 S.Ct. 1850, 1858, 10 L.Ed.2d 805, 815 (1963).

9. *Id.* While this appeal draws in only the second part of § 2680(a)—the discretionary function exemption—the same congressional objective is easily discernible in the first part. See note 3 *supra.* There, by excepting "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid," Congress "intended to preclude any possibility that the [Act] might be construed to authorize suit for damages against the Government growing out of an authorized activity, such as a floodcontrol or irrigation project, where no negligence on the part of any Government agent is shown, and the only ground for suit is the contention that the same conduct by a private individual would be tortious, or that the statute or regulation authorizing the project was invalid." *Dalehite v. United States, supra* note 5, 346 U.S. at 29 n. 21, 73 S.Ct. at 964 n. 21, 97 L.Ed. at 1437 n. 21, quoting H.R.Rep. No. 1287, 79th Cong., 1st Sess. 5–6 (1945). See also *Dupree v. United States,* 247 F.2d 819, 824–825 (3d Cir.1957); *Miller v. United States,* 583 F.2d 857, 867–868 (6th Cir.1978).

In *Eastern Air Lines v. Union Trust Co.*,[10] a mid-air collision resulting in multiple fatalities was attributed to negligence of federal employees directing air traffic from an airport control tower. The Government argued that the exemption "incorporates into the Act the historic principle that the courts will not, in a private action, revise or review executive conduct involving the exercise of judgment or discretion *of a public character*,"[11] and the court had "no doubt that the principle was consciously restated by Congress when it" enacted the exemption.[12] The court rejected, however, the Government's further contention "that the tower operators' duties are public in nature and involve the exercise of discretion and judgment,"[13] holding instead "that the tower operators merely handled operational details which are outside the area of the discretionary functions and duties referred to in § 2680(a)."[14] "[D]iscretion," the court added, "was exercised when it was decided to operate the tower, but the tower personnel had no discretion to operate it negligently."[15]

The discretionary function exemption thus emerged from *Eastern Air Lines* as a safeguard against interference, through the medium of a tort action, with "executive conduct involving the exercise of judgment or discretion of a public character."[16] This concept has received recognition in later decisions of this court,[17] and other courts have shared it.[18] As *Dalehite* makes explic-

**10.** 95 U.S.App.D.C. 189, 200–206, 221 F.2d 62, 73–79, *aff'd sub nom. United States v. Union Trust Co.*, 350 U.S. 907, 76 S.Ct. 192, 100 L.Ed. 799 (1955).

**11.** 95 U.S.App.D.C. at 202, 221 F.2d at 74–75 (emphasis supplied).

**12.** *Id.* at 202, 221 F.2d at 75. This is not to be taken as a suggestion that the discretionary function exemption borrows the governmental-proprietary distinction from municipal law. *Eastern Air Lines* rejected that notion, *id.* at 201–202, 221 F.2d at 73–74, as the Supreme Court was later to do also. *Indian Towing Co. v. United States,* 350 U.S. 61, 65, 76 S.Ct. 122, 124, 100 L.Ed. 48, 53–54 (1955); *Rayonier, Inc. v. United States,* 352 U.S. 315, 319, 77 S.Ct. 374, 376–377, 1 L.Ed.2d 354, 358 (1957). To say that the exemption immunizes judgments "of a public character" is no more than to reflect the view that Congress did not extend the assimilation of governmental and private liability to the point that it would support claims for damages based on discretionary exercises in areas wherein the courts have traditionally declined to substitute their judgment for that of the official to whom the discretion was confided.

**13.** 95 U.S.App.D.C. at 202, 221 F.2d at 74–75.

**14.** *Id.* at 202, 221 F.2d at 75.

**15.** *Id.* at 205, 221 F.2d at 77. The court distinguished *Dalehite* on the ground that each of the acts there characterized as negligent was directed by the fertilizer-production and -distribution plan previously formulated. *Id.* at 204, 221 F.2d at 76–77. Indeed, the *Dalehite* Court itself declared that "[t]he decisions held culpable were all responsibly made at a planning rather than operational level and involved considerations more or less important to the prac-

ticability of the Government's fertilizer program." 246 U.S. at 42, 73 S.Ct. at 971, 97 L.Ed. at 1444.

**16.** The *Eastern Air Lines* court likened its interpretation of the discretionary function exemption to *Dalehite*'s pronouncement that "[t]he 'discretion' protected by the section . . . is the discretion of the executive or the administrator to act according to one's judgment of the best course, a concept of substantial historical ancestry in American law." 346 U.S. at 34, 73 S.Ct. at 697, 97 L.Ed. at 1440 (footnote omitted). That, said *Eastern Air Lines,* "is the 'historic principle,' referred to in the Government's brief," see text *supra* at note 11, "about which there can be no dispute." 95 U.S.App.D.C. at 203 n. 15, 221 F.2d at 76 n. 15.

**17.** *Hitchcock v. United States,* 214 U.S.App. D.C. 198, 207–208, 665 F.2d 354, 363–364 (1981); *Sami v. United States,* 199 U.S.App. D.C. 173, 184–185, 617 F.2d 755, 766–767 (1979). See also Majority Opinion (Maj.Op.) at 600.

**18.** *E.g., Smith v. United States, supra* note 4, 375 F.2d at 248 ("[t]he United States is immune from liability in the present case not because of the mere fact that government officials made choices, but because the choices made affected the political (not merely the monetary) interests of the nation"); *Miller v. United States, supra* note 9, 583 F.2d at 866 (discretionary function exemption "does not insulate the Government from liability for all mistakes of judgment of its agents, but only for significant policy and political decisions, the types of governmental decisions which should not be circumscribed by customary tort standards"); *Downs v. United States, supra* note 4, 522 F.2d at 997 ("the basic question concerning the ex-

it, it forecloses intrusions on such governmental prerogatives as policy judgment and decision,[19] planning and initiation of programs and activities,[20] and execution thereof in accordance with official instructions.[21] As applied by other federal courts, the range of the exemption is fairly broad.[22]

The exemption could not, however, have been intended to subvert the very purpose for which the Act was adopted: subjection of the United States to liability in damages "in the same manner and to the same extent as a private individual under like circumstances"[23] when the latter "would be liable to the claimant in accordance with the law of the place where the act or omission occurred."[24] As *Dalehite* itself acknowledges, "the draftsmen [of Section 2680(a)] did not intend it to relieve the Government from liability for such common-law torts as an automobile collision caused by the negligence of an employee ... of the administering agency."[25] The exemption was not designed to bar liability for personal injury negligently inflicted by a government employee upon an inmate of a federal prison,[26] or liability for death stemming from the negligence of a government agent in dealing with a highjacked aircraft.[27] Situations judicially deemed beyond the exemption's ambit, notwithstanding involvement of some element of discretion, are both numerous and varied.[28]

I do not suggest that the test formulated in *Eastern Air Lines* is necessarily the panacea for all of the perplexing problems the discretionary function exemption is prone

ception is whether the judgments of a Government employee are of 'the nature and quality' which Congress intended to put beyond judicial review") (quoting *Smith v. United States, supra* note 4, 375 F.2d at 246) (citation omitted).

**19.** *Dalehite v. United States, supra* note 5, 346 U.S. at 36, 73 S.Ct. at 968, 97 L.Ed. at 1441.

**20.** *Id.* at 34–36, 73 S.Ct. at 967–968, 97 L.Ed. at 1440–1441.

**21.** *Id.* at 36, 73 S.Ct. at 968, 97 L.Ed. at 1441.

**22.** *E.g., Goddard v. District of Columbia Redev. Land Agency,* 109 U.S.App.D.C. 304, 306–307, 287 F.2d 343, 345–346, *cert. denied,* 366 U.S. 910, 81 S.Ct. 1085, 6 L.Ed. 235 (1961) (timing of condemnation proceedings); *Morton v. United States,* 97 U.S.App.D.C. 84, 85, 228 F.2d 431, 432 (1955), *cert. denied,* 350 U.S. 975, 76 S.Ct. 452, 100 L.Ed. 845 (1956) (transfer of prisoner to, and care afforded prisoner in, federal medical center); *J.H. Rutter Rex Mfg. Co. v. United States, supra* note 4, 515 F.2d at 98–99 (delay of National Labor Relations Board in securing compliance with reinstatement order); *Reminga v. United States,* 631 F.2d 449, 457–458 (6th Cir.1980) ("no hazard" determination respecting television tower *vis-a-vis* air traffic, and failure to require marking of guy wires); *Slagle v. United States,* 612 F.2d 1157, 1162 (9th Cir. 1980) (decision on type of communication system to be maintained between drug informants and their contacts); *Monarch Ins. Co. v. District of Columbia,* 353 F.Supp. 1249, 1256–1259 (D.D.C.1973), *aff'd,* 162 U.S.App.D.C. 97, 497 F.2d 684, *cert. denied,* 419 U.S. 102, 95 S.Ct. 497, 42 L.Ed.2d 295 (1974) (formulation and implementation of riot control plan). See also *Golden Holiday Tours v. CAB,* 174 U.S.App. D.C. 292, 294 n. 6, 531 F.2d 624, 626 n. 6 (1976); cases collected in *Sami v. United States, supra* note 17, 199 U.S.App.D.C. at 184, 617 F.2d at 766.

**23.** 28 U.S.C. § 2674(a) (1976), quoted *supra* note 1.

**24.** 28 U.S.C. § 1346(b) (1976).

**25.** *Dalehite v. United States, supra* note 5, 346 U.S. at 34, 73 S.Ct. at 967, 97 L.Ed. at 1440; accord, *Crouse v. United States,* 137 F.Supp. 47, 49 (D.Del.1955); *Sullivan v. United States,* 129 F.Supp. 713 (N.D.Ill.1955). See also *Downs v. United States, supra* note 4, 522 F.2d at 995.

**26.** *United States v. Muniz, supra* note 8.

**27.** *Downs v. United States, supra* note 4, 522 F.2d at 994–998.

**28.** *E.g., Eastern Air Lines v. Union Trust Co., supra* note 10, 95 U.S.App.D.C. at 200–206, 221 F.2d at 73–79 (direction of air traffic); *Griffin v. United States,* 500 F.2d 1059, 1063–1069 (3d Cir.1974) (compliance with standard governing release of polio vaccine); *White v. United States,* 317 F.2d 13, 16–18 (4th Cir.1963) (supervision of mental patient); *Moyer v. Martin Marietta Corp.,* 481 F.2d 585, 594–598 (5th Cir. 1973) (design and manufacture of aircraft injection seat); *United States v. DeCamp,* 478 F.2d 1188, 1191–1192 (9th Cir.), *cert. denied,* 414 U.S. 924, 94 S.Ct. 232, 38 L.Ed.2d 158 (1973) (observance of safety regulation).

to breed.[29] Concededly, the nature of the exemption is yet to be fully and clearly defined, and its boundaries are yet to be firmly marked. Nevertheless, the matter on which I differ from my colleagues hardly seems to require greater clarity or precision than *Eastern Air Lines* already affords. The subject of our disagreement is the type of judgment summoned by the procedures established for issuance of airman medical certificates, and simple adherence to *Eastern Air Lines'* guiding principle, I think, leads to a sound conclusion. In a word, we need only determine whether those procedures called for any "exercise of judgment or discretion of a public character."[30]

## II

Whatever the reach of the discretionary function exemption with respect to other activities, many courts have held that medical decisions by governmental personnel are beyond its pale,[31] and for reasons strongly appealing to me. Ordinarily, medical decisions do not involve any consideration of public interests or policy;[32] normally, they are predicated upon factors having medical value only. Governmental medical personnel may be required to observe prescribed procedures and to apply prescribed standards, but in the end their judgments usually rest upon medically-significant facts, medical knowledge and skill, and medical phenomena, not unlike those rendered in the private medical sector.[33] To be sure, medical determinations invariably draw on discretion, but medical rather than governmental judgment is what is generally utilized.[34] When no "exercise of judgment or discretion of a public character" is discerni-

**29.** See Reynolds, *The Discretionary Function Exception of the Federal Tort Claims Act,* 57 Geo.L.J. 81 (1968).

**30.** See text *supra* at note 11. Though my colleagues mention "the guiding distinction between 'planning' and 'operational' duties," Maj.Op. at 600, citing *Sami v. United States, supra* note 17, 199 U.S.App.D.C. at 183–184, 617 F.2d at 765–766, the test they undertake to apply seemingly is the one I espouse. See Maj.Op. at 600, 603–604 & nn. 18–19.

**31.** *E.g., Supchak v. United States,* 365 F.2d 844, 845–846 (3d Cir.1966) (examination by Veterans Administration medical officer); *Rise v. United States,* 630 F.2d 1068, 1072 (5th Cir. 1980) (decision by Army physician to refer patient to private hospital); *Underwood v. United States,* 356 F.2d 92, 98 (5th Cir.1966) (failure of Air Force psychiatrist first treating mentally-ill airman to inform second Air Force psychiatrist, who took over treatment, of airman's threats on wife's life); *Costley v. United States,* 181 F.2d 723, 724–725 (5th Cir.1950) (injection administered in Army hospital); *Jackson v. Kelly,* 557 F.2d 735, 737–739 (10th Cir. *en banc* 1977) (treatment by Air Force physician); *Griggs v. United States,* 178 F.2d 1, 3 (10th Cir.1949), *rev'd on other grounds sub nom. Feres v. United States,* 340 U.S. 135, 71 S.Ct. 153, 95 L.Ed. 152 (1950) (treatment by Army medical personnel); *Doyle v. United States,* 530 F.Supp. 1278, 1284–1285 (C.D.Cal.1982) (diagnosis by Army psychiatrist); *Dishman v. United States,* 93 F.Supp. 567, 570–571 (D.Md.1950) (treatment by Veterans Administration physician); *Grigalauskas v. United States,* 103 F.Supp. 543, 548 (D.Mass.1951), *aff'd,* 195 F.2d 494 (1st Cir.

1952) (treatment by Army physician); *Moon v. United States,* 512 F.Supp. 140, 144 (D.Nev. 1981) (diagnosis and treatment by Veterans Administration psychiatrists); *Rufino v. United States,* 126 F.Supp. 132, 136 (S.D.N.Y.1954) (insulin therapy at Veterans Administration hospital); *Hunter v. United States,* 236 F.Supp. 411, 412–413 (M.D.Tenn.1964) (diagnosis by prison physician). Sometimes the decisionmaker is called upon to weigh public as well as medical considerations, in which event a different result may be warranted. See, *e.g., Smart v. United States,* 207 F.2d 841, 842–843 (10th Cir.1953); compare *White v. United States,* 317 F.2d 13, 17–18 (4th Cir.1963).

**32.** See *Rise v. United States, supra* note 31, 630 F.2d at 1070; *Jackson v. Kelly, supra* note 31, 557 F.2d 738, 739; *Doyle v. United States, supra* note 31, 530 F.Supp. at 1283; *Moon v. United States, supra* note 31, 512 F.Supp. at 144.

**33.** See *Costley v. United States, supra* note 31, 181 F.2d at 725; *Jackson v. Kelly, supra* note 31, 557 F.2d at 738, 739.

**34.** See *Jackson v. Kelly, supra* note 31, 557 F.2d at 738–739. Compare *Spencer v. General Hosp.,* 138 U.S.App.D.C. 48, 58, 425 F.2d 479, 489 (*en banc* 1969) (Wright, J., concurring) ("[t]his is not to say that the performance of an operation does not involve judgment and discretion. The point is that *medical,* not *governmental,* judgment and discretion are involved") (emphasis in original); *Henderson v. Bluemink,* 167 U.S.App.D.C. 161, 164–165, 511 F.2d 399, 402–403 (1974).

ble, no basis for invocation of the exemption is present.

Decisions in this circuit amply support this rationale. In *Hitchcock v. United States*,[35] we held the discretionary function exemption inapplicable to a claim of negligence based upon a failure to inform a woman given pre-exposure rabies immunization injections of risks incidental thereto—a violation of the physician-patient duty.[36] We "read section 2680 and *Dalehite* and its progeny to establish the rule that, where the government acts negligently for reasons unrelated to public policy considerations, it is liable to those it injures;"[37] applying that test, we found "that the acts and omissions found actionable were not 'so fraught with ... public policy considerations' as to render them discretionary within the meaning of the Act."[38] Factually closer to the case at bar is *Duncan v. United States*,[39] where an airline pilot sought a medical certificate under the regulations involved here, and the holding was that negligence in denying the certificate was beyond the scope of the exemption.[40] *Duncan* relied upon the Second Circuit's decision in *Hendry v. United States*,[41] which reached the same conclusion with respect to a determination by federal medical personnel that a ship's officer was a paranoid schizophrenic and unfit for sea duty.[42]

My colleagues dismiss *Hendry,* and with it *Duncan,* on the argument that "[i]n this case, however, the neurologic standard left the Air Surgeon a limited policy judgment as to whether appellant's medical condition would allow him to perform safely the duties of a commercial pilot."[43] They explain:

> In making his decision, the Air Surgeon had to evaluate how, and the likelihood that, appellant would have future neurologic problems that could impinge on his performance as a pilot. Then the Air Surgeon had to calculate the possible effects of the problems on air safety.[44] This was not just a matter of testing known medical facts against a clear medical standard. For these reasons, we conclude that the specific determinations of the Air Surgeon about this appellant's neurologic fitness constituted an exercise of discretion under the terms of the exception in 28 U.S.C. § 2680(a).[45]

With deference, I cannot accept this reasoning. The Administrator of the Federal Aviation Administration (FAA) is empowered to issue an airman certificate if, after investigation, he finds that the applicant therefor "possesses proper qualifications for, and is physically able to perform the duties pertaining to, the position for which the airman certificate is sought."[46] FAA regulations prescribe numerous requirements to be met by applicants,[47] including possession of an appropriate medical certificate.[48] Pursuant to statute,[49] the Adminis-

---

**35.** *Supra* note 17.

**36.** *Canterbury v. Spence,* 150 U.S.App.D.C. 263, 464 F.2d 772, *cert. denied,* 409 U.S. 1064, 93 S.Ct. 560, 34 L.Ed.2d 518 (1972).

**37.** *Hitchcock v. United States, supra* note 17, 214 U.S.App.D.C. at 207–208, 665 F.2d at 363–364.

**38.** *Id.* at 207, 665 F.2d at 363, quoting *Sami v. United States, supra* note 17, 199 U.S.App.D.C. at 185, 617 F.2d at 767.

**39.** 355 F.Supp. 1167 (D.D.C.1973).

**40.** *Id.* at 1169–1170.

**41.** 418 F.2d 774 (2d Cir.1969).

**42.** *Id.* at 779–783.

**43.** Maj.Op. at 604 n. 18.

**44.** In further elucidation, they say:

> In making his decision, the Air Surgeon was presumably to consider such factors as the responsibilities of a commercial airline pilot, the technology of the aircraft, the demands inherent in the nation's flight traffic system, and the available backup personnel and equipment.

*Id.* at n. 18.

**45.** *Id.* at 604.

**46.** 49 U.S.C. § 1422(a)–(b) (1976).

**47.** 14 C.F.R. §§ 61.1–201 (1982).

**48.** *Id.* § 61.3(c).

**49.** 49 U.S.C. § 1344(d) (1976).

trator has delegated to the Federal Air Surgeon authority "to issue or deny medical certificates," but only "to the extent necessary to . . . [e]xamine applicants for and holders of medical certificates for compliance with applicable *medical* standards; and . . . [i]ssue, renew, or deny medical certificates to applicants and holders based upon compliance or noncompliance with applicable *medical* standards." [50] The neurologic standard applicable here uniformly specifies, with respect to each of the three classes of medical certificates, that the applicant must have

> [n]o other convulsive disorder, disturbance of consciousness, or neurologic condition [51] that the Federal Air Surgeon finds
>
> *(a)* Makes the applicant unable to safely perform the duties or exercise the privileges of the airman certificate that he holds or for which he is applying; or
>
> *(b)* May reasonably be expected, within two years after the finding, to make him unable to perform those duties or exercise those privileges; and the findings are based on the case history and appropriate, qualified, *medical* judgment relating to the condition involved.[52]

I see nothing that requires or permits a decision on anything other than medical considerations.[53] The authority delegated to the Federal Air Surgeon is expressly limited to certification or noncertification dependent upon the applicant's compliance with medical standards,[54] and the neurologic standards relevant here uniformly require the Air Surgeon's "findings" to be based on the case history and appropriate, qualified, medical judgment relating to the condition involved." [55] True it is that the determination must be made in terms of the applicant's ability to safely perform the duties imposed, or exercise the privileges conferred, by the certificate sought,[56] but a straightforward reading of the regulations confines that determination to the effect of the applicant's neurologic health on air safety.[57] It no more involves a discretionary exercise of a public character than a conclusion that person is too ill to work, or to operate a motor vehicle or motorboat, or is well enough to do so. I thus would conclude that the medical certification process calls for a decision wholly medical in nature, and not for a judgment intercepted by the discretionary function exemption.

### III

Disagreement with my colleagues on application of the exemption to the neurologic phase of airman medical certification does not, however, alter my outcome on the appeal. The District Court did not consider the exemption at all; instead, it carefully examined appellant's charges of negligence and held that none was sustained by the evidence.[58] My review leads me to conclude

**50.** 14 C.F.R. § 67.25(a) (1982) (emphasis supplied).

**51.** Some neurologic conditions are absolutely disqualifying. *Id.* §§ 67.13(d)(2)(i) (first-class medical certificate); 67.15(d)(2)(i) (second-class certificate); 67.17(d)(2)(i) (third-class certificate).

**52.** *Id.* §§ 67.13(d)(2)(ii) (first-class medical certificate); 67.15(d)(2)(ii) (second-class medical certificate); 67.17(d)(2)(ii) (third-class medical certificate) (emphasis supplied).

**53.** Even if the regulations were less explicit in regard to the type of decision to be made, it would be strange indeed for Congress to impose on medical experts the responsibility of determinations requiring expertise in the many other aspects of air safety. And see note 57 *infra.*

**54.** See text *supra* at note 50.

**55.** See text *supra* at note 52.

**56.** See text *supra* at note 52.

**57.** Aside from clarity of the regulations' specifications, medical certification is but a part of the much larger process of ascertaining fitness to pilot an aircraft—a process by which fitness from viewpoints other than medical is thoroughly investigated. See 14 C.F.R. §§ 61.1–61.201 (1982).

**58.** *Beins v. United States,* Civ. No. 79–3322 (D.D.C. Aug. 5, 1981) (findings of fact and conclusions of law), Appendix 1.

that the court's factual findings are not clearly erroneous,[59] nor its legal determinations faulty. I would dispose of the neurologic-testing issue on this basis, and, encountering no further difficulty with today's decision, I join in affirmance of the District Court's judgment.